IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF OHIO
EASTERN DIVISION

| | | |
|---|---|---|
| NARKITA J. SUMMERS, | ) | CASE NO. 1:20-cv-01280 |
| | ) | |
| Plaintiff, | ) | JUDGE JAMES S. GWIN |
| | ) | |
| v. | ) | MAGISTRATE JUDGE |
| | ) | KATHLEEN B. BURKE |
| COMMISSIONER OF SOCIAL | ) | |
| SECURITY ADMINISTRATION, | ) | |
| | ) | **REPORT AND RECOMMENDATION** |
| Defendant. | ) | |

Plaintiff Narkita J. Summers (Plaintiff" or "Summers") seeks judicial review of the final decision of Defendant Commissioner of Social Security ("Commissioner") denying her applications for Supplemental Security Income ("SSI") and Disability Insurance Benefits ("DIB").  Doc. 1.  This Court has jurisdiction pursuant to 42 U.S.C. § 405(g).  This matter has been referred to the undersigned Magistrate Judge for a Report and Recommendation pursuant to Local Rule 72.2.

For the reasons set forth below, the undersigned recommends that the Court **AFFIRM** the Commissioner's decision.

## I.  Procedural History

On January 10, 2017, Summers protectively filed applications for DIB and SSI.[1]  Tr. 15, 110, 218-233.  Summers initially alleged a disability onset date of January 15, 2016, but later amended her alleged onset date to February 1, 2017.  Tr. 15, 37-41, 258.  She alleged disability

---

[1] The Social Security Administration explains that "protective filing date" is "The date you first contact us about filing for benefits. We may use this date to establish an earlier application date than when we receive your signed application."  http://www.socialsecurity.gov/agency/glossary/ (last visited 6/23/2021).

due to cervical spondylotic myelopathy, blood pressure issues, high cholesterol, bulging disc in neck and back, spinal cord compression, disc herniation in neck and back, severe nerve pain, bad lumbar, deteriorated disc in back, numbness and tingling in hands and feet, poor circulation in both legs, tendonitis in both arms, and anxiety disorder.  Tr. 76-77, 143, 154, 275.  After initial denial by the state agency (Tr. 142-149) and denial upon reconsideration (Tr. 154-158), Summers requested a hearing (Tr. 159-161).  On February 25, 2019, a hearing was held before an Administrative Law Judge ("ALJ").  Tr. 34-67.

On April 9, 2019, the ALJ issued a decision unfavorable to Summers (Tr. 12-33), finding that she had not been under a disability within the meaning of the Social Security Act from February 1, 2017, through the date of the decision (Tr. 28).  Summers requested review of the ALJ's decision by the Appeals Council. Tr. 215-217.  On April 16, 2020, the Appeals Council denied Summers's request for review, making the ALJ's decision the final decision of the Commissioner.  Tr. 1-6.

## II. Evidence

### A.    Personal, educational, and vocational evidence

Summers was born in 1973.  Tr.  27, 220.  Summers worked as a home care provider/attendant from 2005 through 2016.  Tr. 43-46.  She performed the work as an independent contractor.  Tr. 45.  Her most recent employment was a sales job that she performed on a part-time basis.  Tr. 46.  She was responsible for cold calling on prospective customers within a given territory to try to sell gas and electric services.  Tr. 46-50.

### B.    Medical evidence

#### 1.    Treatment history

*Physical impairments*

2

In October 2016, Summers saw Dr. Samuel Rosenberg, M.D., in the neurosurgery department at Metro Health.  Tr. 378-380.[2]  Dr. Rosenberg noted that Summers presented with a 10-year history of low back pain with no traumatic event; numbness/tingling in her bilateral lower extremities for two months; reports of back locking up with standing; urinary urgency but denial of urinary/bowel incontinence; complaints of neck/shoulder pain with paraesthesia in the hands bilaterally; and reports of weakness and numbness throughout her dominant left hand.  Tr. 378.  On physical examination, Dr. Rosenberg observed a normal gait; severe weakness with left bicep and mild weakness with right extensor hallucis longus; decreased sensation in the left hand; deep tendon reflexes were hyperreflexic; and negative straight leg raise.  Tr. 380.  Dr. Rosenberg's impression was left C6 radiculopathy with myelopathy and right L5 radiculopathy.  Tr. 380.  Dr. Rosenberg ordered a cervical and lumbar MRI, noting that he was not comfortable sending Summers to physical therapy without getting an MRI.  Tr. 380.  He prescribed a trial of Neurontin (gabapentin).  Tr. 380.

Summers had her MRI and, on December 13, 2016, she saw Dr. Rosenberg along with Dr. Timothy Moore, M.D., in the orthopedics department at Metro Health to talk about the cervical MRI results, which showed "[m]oderate to severe multifocal cord compression secondary to spondylosis" (Tr. 512-513).  Tr. 510.  On physical examination, Dr. Moore observed that Summers was "a little bit . . . weak in her left upper extremity, may be 5-/5 in her biceps and brachial radialis."  Tr. 510.  Summers was "hyperreflexic throughout."  Tr. 510.  She

---

[2] Record is also found at Tr. 517-519.

3

had "significant Hoffman sign[3] bilaterally, she [had] a Lhermitte sign.[4]"  Tr. 510.  Summers

did "[o]kay with tandem walking," but she was "a little bit clumsy."  Tr. 510.  Dr. Moore's

impression was "severe cervical spondylosis, severe cord compression."  Tr. 511.  Dr. Moore

indicated that he offered Summers surgery at her earliest convenience to stop the progression of

what was occurring.  Tr. 511.  He noted, however, that there was no guarantee that Summers

would be better following the surgery.  Tr. 511.

Summers decided to proceed with surgery.  Tr. 364.  Prior to the surgery, Summers had a

CT scan of the spine that showed "[m]ulitlevel degenerative changes and congenital

narrowing[]."  Tr. 588-589.  Also, prior to her surgery, she met with Dr. Moore on January 26,

2021.  Tr. 364.  During that visit, Dr. Moore noted Summers "ha[d] a large C6-7 disk complex

causing cord compression that [wa]s soft disk herniation."  Tr. 364.

On February 1, 2017, Dr. Moore performed surgery (Tr. 540-544), which consisted of

"extensive anterior-posterior cervical decompression and reconstruction for severe spinal cord

compression, myelopathy with C6-7 anterior cervical diskectomy and fusion, posterior cervical

laminoplasty and fusion C3-C7[.]" (Tr. 540-544).  Summers was discharged on February 3,

2017.  Tr. 471.

Summers saw Dr. Moore on February 14, 2017, for her first appointment following her

discharge.  Tr. 494-495.  Summers was doing "very well[]" and her "[s]welling issues [were]

greatly improved."  Tr. 495.  Summers "remain[ed] neurologically intact."  Tr. 495.

---

[3] "The Hoffman sign is an involuntary flexion movement of the thumb and or index finger when the examiner flicks the fingernail of the middle finger down."  https://www.ncbi nlm nih.gov/books/NBK545156/ (last visited 6/23/2021).

[4] "Lhermitte's sign (also known as Lhermitte's phenomenon and the barber chair phenomenon) describes a transient sensation of an electric shock extending down the spine and/or extremities upon flexion of the neck, often a sequela of neurologic disease." https://www.ncbi nlm nih.gov/books/NBK493237/  (last visited 6/23/2021).

Summers saw Dr. Moore again on March 28, 2017.  Tr. 493.  She reported "having a pretty rough time."  Tr. 493.  She was experiencing "burning in her feet," with "varying symptoms in her hands."  Tr. 493.  However, she did report that "her posterior neck pain [was] getting significantly better[]" and she had "[n]o bowel or bladder symptoms."  Tr. 493.  On examination, Dr. Moore indicated that Summers "remain[ed] neurologically intact[.]"  Tr. 493.  However, she was "still hyperreflexic[.]"  Tr. 493.  Dr. Moore's impression was that Summers was "doing okay now at 7 weeks."  Tr. 493.  A cervical spine x-ray (lateral only) taken on March 28, 2017, showed "[n]o evidence of any postsurgical complication[.]"  Tr. 580.

During an April 11, 2017, primary care visit for complaints of abdominal pain, Summers continued to report pain and burning in her hands and feet.  Tr. 489.  Her gait was normal and her coordination was intact.  Tr. 491.

On May 9, 2017, cervical spine x-rays (flexion and extension views) were taken.  Tr. 572.  The x-rays showed "some limited range of motion[]" but "[n]o pathological subluxation [was] identified."  Tr. 572.  Also, on May 9, 2017, Summers saw Dr. Moore.  Tr. 482.  Summers indicated that she was "very miserable, more miserable than expected 3 months after [surgery]."  Tr. 482.  She relayed that "she just [did] not feel well[]" and she was "not sleeping at night and wanted something to sleep."  Tr. 482.  Dr. Moore observed that Summers "remain[ed] neurologically intact[]" and he noted there were no issues showing on the flexion and extension views of her cervical spine.  Tr. 482.  Dr. Moore's impression was that Summers was "doing okay at 3 months."  Tr. 483.  He wrote Summers a prescription for therapy; refilled her pain medications one last time; and provided her a prescription for Flexeril.  Tr. 483.  He suggested that Summers see her primary care physician and consider lab work to see if something else was going on.  Tr. 483.  Dr. Moore also instructed Summers to continue with her exercises.  Tr. 483.

On May 18, 2017, Summers saw Tyecia Stevens, CNP, in the Physical Medicine and Rehabilitation (PM&R) Clinic at Metro Health regarding her neck pain.  Tr. 723-727.  Summers reported "feeling worse than before [her] surgery."  Tr. 724.  Summers indicated that her shoulder blades burned; she had shooting pain down her neck; she had good and bad days; and her pain was worse in the evenings.  Tr. 724.  Summers also indicated that she was "a bit depressed because the after effect [was] taking a tol[l] on her."  Tr. 724.  Also, she had no income and others did not understand what she was going through.  Tr. 724.  Summers complained of "breathing disturbance[.]"  Tr. 724.  Summers tried gabapentin but it made her sick.  Tr. 724.  She was taking Percocet and it took "the edge off[.]"  Tr. 724.  Summers' symptoms were disturbing her sleep.  Tr. 724.  On examination, Summers had moderately decreased range of motion and tenderness in her neck; there was no evidence of spasm, no evidence of trigger points and Spurling's maneuver[5] was negative.  Tr. 727.  The neurological examination showed that Summers' reflexes were 2+ in the bilateral upper extremities; negative Hoffman bilaterally; tingling in the dermatomal regions of the bilateral upper extremities; motor strength was normal in the myotomal regions of the bilateral upper extremities; fine motor coordination was normal; and Summers was able to heel walk, toe walk, and tandem gait without difficulty.  Tr. 727.  Ms. Stevens recommended physical therapy for her cervical and lumbar spine; discontinuation of gabapentin; and a refill of Percocet while Summers was in physical therapy.  Tr. 727.

Summers started physical therapy on May 25, 2017.  Tr. 719.  Summers reported that she stayed in bed most of the time because her neck was painful and she was easily fatigued.  Tr.

---

[5] "The Spurling's test (also known as Maximal Cervical Compression Test and Foraminal Compression Test) is used during a musculoskeletal assessment of the cervical spine when looking for cervical nerve root compression causing Cervical Radiculopathy."  https://www.physio-pedia.com/Spurling%27s_Test#cite_note-Konin_et_al-1 (footnote omitted) (last visited 6/23/2021).

719.  She also reported upper extremity and cervical pain and weakness as well as difficulty with walking, balancing and stairs.  Tr. 719.  Summers indicated that she was performing some cervical active range of motion.  Tr. 719.  Summers' reported pain level was 0/10 at rest and 6/10 with movement in the cervical spine, bilateral subscapular.  Tr. 721.  Summers ambulated into the office "with guarded posture wearing wedges flip-flops[.]"  Tr. 721.

During a May 30, 2017, visit with Dr. Rosenberg, Summers complained mostly of "right leg pain associated wit[]h intermittent foot drop and dense numbness right foot[.]"  Tr. 719.  Dr. Rosenberg noted that Summers "appear[ed] to be in severe pain[.]"  Tr. 719.  She had an antalgic gait, numbness and weakness in her left lower extremity, and a positive straight leg raise on the left.  Tr. 719.  Dr. Rosenberg ordered an MRI.  Tr. 719.

During a physical therapy visit on June 7, 2017, with physical therapist Andrea Gonzalez, Summers continued to report that she stayed in bed most of the time because her neck was painful and she was easily fatigued.  Tr. 716.  She also reported upper extremity and cervical pain and weakness as well as difficulty with walking, balancing and stairs.  Tr. 716.  Summers indicated that she was performing some cervical active range of motion.  Tr. 716.  Ms. Gonzalez's assessment was that Summers presented with moderate neck pain with cervical range of motion restrictions.  Tr. 718.  Ms. Gonzalez explained to Summers the importance of improving her cervical range of motion and posture control.  Tr. 718.

In July 2017, Summers attended another physical therapy session (Tr. 706-709) and she participated in weekly psychotherapy outpatient group sessions that were focused on chronic pain rehabilitation (Tr. 706, 838).

Summers saw Ms. Stevens again on July 20, 2017.  Tr. 834-838.  Summers reported feeling "terrible."  Tr. 834.  She was getting an updated MRI of her lumbar spine to determine

whether her herniated disc was bigger.  Tr. 834.  Summers relayed that her lower extremities were worse than her neck.  Tr. 834.  She was attending physical therapy and it was helping – she was not as stiff.  Tr. 834.  She still had radicular symptoms down her arms.  Tr. 834.  Physical examination findings were similar to those from Summers' May 2017 visit with Ms. Stevens.  Tr. 837.  Ms. Stevens recommended that Summers continue with physical therapy, home exercises, and "therapy and groups[.]"  Tr. 837.  Also, she recommended use of Percocet while in physical therapy but not for chronic use.  Tr. 837.

An MRI of the lumbar spine taken on July 31, 2017 (Tr. 851-852), showed "[l]ower lumbar degenerative change with a broad-based bulging disk at L5-S1, facet hypertrophy and moderate resultant stenosis with compression of the thecal sac." (Tr. 852).  There were "[s]imilar findings to a lesser degree at L4-5[;] [n]o large disc extrusion[;] [and] [n]o findings of vertebral metastasis or occult fracture."  Tr. 851.

Summers saw Dr. Rosenberg on August 4, 2017.  Tr. 995-996.  Summers complained of back and bilateral leg weakness and numbness and she reported that she could barely stand up.  Tr. 996.  Summers also indicated that she could only walk for a few minutes and she had left-sided neck pain.  Tr. 996.  On examination, Dr. Rosenberg observed that Summers looked "sleepy and in pain[]."  Tr. 996.  She had "[n]o lower extremity weakness nor numbness[.]"  Tr. 996.  She had "weak finger extensors and flexors[.]"  Tr. 996.  Hoffman's were positive.  Tr. 996.  Dr. Rosenberg recommended an interlaminar epidural steroid injection at L4-5 and L5-S1.  Tr. 996.

On August 15, 2017, Summers had an x-ray of the cervical spine (flexion and extension views).  Tr. 1006-1007.  The x-ray showed that Summers' alignment and hardware were intact.  Tr. 1006-1007.  Also, on August 15, 2017, Summers saw Dr. Moore.  Tr. 1002-1003.  Dr.

Moore noted that Summers "look[ed] much better[,]" noting that "she was in pretty significant postoperative misery."  Tr. 1002.  Dr. Moore noted also that Summers had been seeing Dr. Rosenberg for low back issues.  Tr. 1002.  On examination, Dr. Moore observed that Summers' incisions were "healing appropriately"; she "remained neurologically intact"; and "[h]er dysesthetic hands [were] subjectively improved."  Tr. 1002.  Dr. Moore indicated that the cervical spine x-rays showed no issues.  Tr. 1002.  Dr. Moore's impression was that Summers was "doing well now at 7 months."  Tr. 1003.  Dr. Moore advised that it was okay for Summers to proceed with conservative treatment for her low back but he did not want her to have any cervical injections until she was one year post-op.  Tr. 1003.  Dr. Moore recommended repeat cervical spine x-rays in February.  Tr. 1003.

On October 27, 2017, Summers saw one of her primary care providers, Sharon Foster-Geeter, APRN-CNP, for follow up regarding complaints of increased shortness of breath with any kind of activity.  Tr. 1008.  Summers relayed that she was continuing to attend physical therapy but she now had lower back pain that radiated into her left leg and feet. Tr. 1008.  On examination, Nurse Foster-Geeter observed a normal gait, intact coordination, upper extremity weakness, limited range of motion in the neck, and normal mood and affect.  Tr. 1011. Identified diagnoses included essential hypertension; osteoarthritis of cervical spine with myelopathy; osteoarthritis of spine with radiculopathy, lumbar region; shortness of breath; depression, unspecified depression type; and anxiety.  Tr. 1012.  Nurse Foster-Geeter entered an arthritis service request and a psychiatry service request.  Tr. 1012.  She also ordered pulmonary function testing (Tr. 910-911, 1012) and a chest x-ray for the shortness of breath (Tr. 1012, 1014, 1016).  The chest x-ray that Nurse Foster-Geeter ordered showed "no acute cardiopulmonary findings."  Tr. 1016.  The pulmonary function testing was "consistent with a moderate

9

obstructive ventilatory defect without a significant response to inhaled bronchodilators, with air trapping." Tr. 911.  Also, it was indicated that the "findings may be consistent with a diagnosis of asthma and methacholine challenge may be useful.  Clinical correlation is needed."  Tr. 911.

Also, on October 27, 2017, upon Nurse Foster-Geeter's referral, Summers saw Dr. Choung Cho Yue, M.D., for a rheumatology consult.  Tr. 1018-1022.  Dr. Yue noted that Summers had spine surgery in February and, she was now having pain in her hips and knees and her feet were falling asleep.  Tr. 1018.  Summers reported tingling in her fingers, trouble opening pill bottles, and morning stiffness in her hips.  Tr. 1018.  She did not report swelling.  Tr. 1018. On examination, Summers had full range of motion in her neck, shoulders, elbows, wrists, hips, and ankles; her grip strength was 4+/4+.  Tr. 1021.  Dr. Yue observed no tenderness, swelling, or pain during the examination.  Tr. 1021.  Dr. Yue's assessment was: "problem not at all inflammatory in character.  There is plenty of findings of degenerative changes for which there is no disease modifying therapy."  Tr. 1022.  Dr. Yue encouraged Summers to exercise but Summers indicated "she hurts too much."  Tr. 1022.  Dr. Yue also suggested that Summers return to physical medicine and indicated that there was no need for follow up with rheumatology.  Tr. 1022.

Summers saw Nurse Stevens on November 2, 2017.  Tr. 1033.  Summers complained of neck pain.  Tr. 1033.  She relayed that she could not tolerate land therapy – the exercises were too hard and hurt.  Tr. 1033.  However, she was interested in aquatic therapy.  Tr. 1038. Summers reported having breathing issues and bilateral lower extremity pain that was secondary to her lumbar stenosis.  Tr. 1033.  Nurse Stevens noted that Summers' cervical exam revealed a limited range of motion; tenderness; no evidence of spasms or trigger points; and Spurling's maneuver was negative.  Tr. 1038.  The neurological exam showed normal reflexes in the upper

10

extremities; negative Hoffman bilaterally; tingling in the upper extremities; normal motor strength in the upper extremities; normal fine motor coordination; and ability to heel walk, toe walk and tandem gait without difficulty.  Tr. 1038.  Nurse Stevens provided Summers with a prescription for aquatic therapy.  Tr. 1038.  She refilled Summers' Percocet prescription, to be used while in physical therapy, not for chronic use.  Tr. 1038.

On November 14, 2017, Summers started physical therapy again.  Tr. 933-941, 942-945. At her November 14, 2017, physical therapy evaluation, Summers complained of difficulty walking due to her lumbar stiffness, neck stiffness, spinal stenosis, and asthma.  Tr. 933.  She also reported weakness and pain.  Tr. 933.  Summers had been unable to tolerate land-based therapy but the therapist felt that Summers might benefit from aquatic therapy.  Tr. 933. Summers continued with aquatic therapy.  Tr. 946-949 (11/21/2017), 950-953 (11/24/2017), 954-957 (11/28/2017), 958-961 (12/8/2017), 962-968 (1/17/2018).

At her November 21, 2017, therapy session, Summers reported that she "felt so good after last session that [she] went to the gym and did [the] eliptical [sic] machine[.]"  Tr. 946. However, she relayed that her "pain [was] much worse than on Friday."  Tr. 946.  During her November 28, 2017, session, Summers indicated that she had tried the stand-up elliptical and the recumbent bike at the gym and she felt that she had to exercise daily to reduce the pain in her legs.  Tr. 954.  She had been "[a]ble to go about 25 minutes."  Tr. 954.  Summers relayed that her doctor did not want her to use the treadmill because of arthritis in her knee and she was not going to the gym on the days that she attended aquatic therapy.  Tr. 954.  On December 8, 2017, Summers stated she had "pain all over" and felt "tired all the time."  Tr. 958.  Summers was sick in December so she did not attend any additional sessions in December.  Tr. 962.

11

At a January 17, 2018, therapy session, Summers complained of pain down her left leg; she no longer had pain going down her right leg.  Tr. 962.  Summers reported some stress incontinence with coughing.  Tr. 962.  She was advised to follow up with her referring doctor. Tr. 962.  The therapist observed an antalgic gait (left lower extremity) and straight leg raise (left lower extremity).  Tr. 964.

Summers saw Nurse Stevens on January 25, 2018, for follow up.  Tr. 1071.  Summers reported neck pain and left lower extremity pain.  Tr. 1071.  She indicated that her lower extremity pain was constant and radiated from her buttocks to her foot.  Tr. 1071.  She relayed that she had been limping for three weeks.  Tr. 1071.  Summers was concerned about falling, noting she had already had a fall when her leg gave out.  Tr. 1071.  Her medication took the "edge off" but she was still having a lot of discomfort.  Tr. 1071.  Summers indicated that her leg was worse than her neck; aquatic therapy was helping with her neck pain.  Tr. 1071.  Summers needed a new order for therapy for her back and lower extremities.  Tr. 1071.  Examination findings were similar to the findings from Summers' visit with Nurse Stevens in November 2017.  Tr. 1038, 1076-1077.  However, Summers had a positive straight leg raise test on the left with radicular symptoms.  Tr. 1077.  Nurse Stevens provided Summers with a prescription for therapy for her back.  Tr. 1077.

On February 1, 2018, Summers' physical therapist discontinued therapy, noting that Summers had "not returned to therapy or scheduled additional follow-up appointments."  Tr. 969.  At that time, it was noted that "[b]ased on the most recent progress report, patient was progressing slower than expected toward functional goals based on pain levels and appointment compliance."  Tr. 969.

On February 12, 2018, Summers resumed physical therapy.  Tr. 971-979.  Summers'
physical therapist recommended that Summers proceed with land-based therapy rather than
aquatic therapy.  Tr. 971.  Summers' gait was independent but her "stance and push off [was]
decreased [in] [left lower extremity[]."  Tr. 972.   During a March 6, 2018, visit, Summers' chief
complaint was "difficulty walking, weakness of her legs, [n]umbness of both feet, low back
stiffness with difficulty static positions and prolonged walking."  Tr. 980.  Summers' therapist
noted that Summers "present[ed] with impairments of stiff low back, [positive] left straight leg
raise, stiff left hip adduction, external rotation and weak left hip flexion and abduction (more
than [right] hip)."  Tr. 980 (capitalization omitted).  Summers "walk[ed] with poor push off BLE
[bilateral lower extremity]."  Tr. 980.  Summers did not show for a March 12, 2018, therapy
appointment.  Tr. 985-986.  A message was left for her reminding her of the no-show policy.  Tr.
985.  Summers did not show again for therapy on March 19, 2018.  Tr. 987.  Because of the two
consecutive no shows, the therapist spoke with Summers on the telephone.  Tr. 987.  Summers
agreed with her therapist to be discharged from therapy "at [that] time due to extended illness."
Tr. 987.

Summers saw Nurse Stevens on May 10, 2018, complaining of increased neck pain that
was more intense since the prior week.  Tr. 1096.  Summers wanted a neck collar and relayed
that her neck was really stiff after waking up and her shoulders had really been itching.  Tr.
1096.  Summers indicated she attended some therapy sessions for her sciatica but the therapist
did not have her in the water.  Tr. 1096.  Cervical and neurological examination findings were
similar to those from her November 2017 visit with Nurse Stevens.  Tr. 1038, 1102.  Nurse
Stevens refilled Summers' Percocet and Flexeril.  Tr. 1102.  She recommended that Summers
wear a cervical collar and follow up in three months.  Tr. 1102.

13

On August 6, 2018, Summers saw Marion Craig, APRN-CNP, at Metro Health for an urgent visit.  Tr. 1142.  Summers complained of left leg pain, explaining that she was interested in a second referral to rheumatology.  Tr. 1142.  Summers relayed that her pain started in her hip and radiated down to her left knee.  Tr. 1142.  At that time, Summers rated her leg pain as a 10/10.  Tr. 1142.  She was taking Percocet, Flexeril, and Motrin for pain relief.  Tr. 1142.  Summers also indicated that she had been dealing with shortness of breath.  Tr. 1142.  She relayed that testing that had been ordered was positive for asthma and she was instructed to follow up with pulmonary but she first needed a referral.  Tr. 1142.  She was taking Albuterol as prescribed.  Tr. 1142.  On examination, Nurse Craig observed a normal gait.  Tr. 1143.  Nurse Craig advised Summers to continue with her medication as prescribed and she provided referrals, including to rheumatology for her left leg pain and to pulmonary for her asthma.  Tr. 1143.

The next day, on August 7, 2018, Summers went to the emergency room with multiple complaints, including jaw pain, left leg pain, and shortness of breath.  Tr. 1171.  On examination, Summers' strength was 5/5 in bilateral upper and lower extremities, sensation to light touch was intact in all four extremities, and gait was normal.  Tr. 1174.  Testing revealed no evidence of pulmonary embolism or acute cardiopulmonary process and an ultrasound was negative for deep vein thrombus in the left lower extremity.  Tr. 1177.  Summers was instructed to follow up with her doctor and she was discharged home.  Tr. 1177.

Summers saw Nurse Stevens on August 23, 2018, for follow up.  Tr. 1212.  Summers relayed that she was seen in the hospital for possible TMJ.  Tr. 1212.  She continued to have radicular symptoms and her neck felt heavy.  Tr. 1212.  Summers was interested in attending physical therapy at an outside facility.  Tr. 1212.  Cervical and neurological examination findings were similar to those from her May 2018 visit with Nurse Stevens.  Tr. 1102, 1218.  Nurse

Stevens indicated that, other than Summers' new reported TMJ symptoms, Summers' symptoms were the same.  Tr. 1218.  Medications were continued/refilled and Summers was instructed to continue use of cervical collar.  Tr. 1218.

Summers saw Nurse Stevens again on November 29, 2018, for follow up regarding her chronic pain.  Tr. 1295.  Summers reported that she had been urinating on herself during the last few months; she was using pads.  Tr. 1295.  Summers had functional capacity forms from her attorney.  Tr. 1295.  She had started a part-time job that involved a lot of walking.  Tr. 1295. With respect to Summers' lumbar stenosis, Nurse Stevens indicated that in her opinion, Summers was "physically disable[d].  Chronic pain, limited ROM, and sensory dysfunction[.]" Tr. 1301.  Nurse Stevens refilled Summers' Percocet, noted that she would complete the functional capacity form once the fee was received, and she instructed Summers to follow up in three months.  Tr. 1301.

A sleep study performed in January 2019 resulted in diagnoses of obstructive sleep apnea, obesity, inadequate sleep hygiene, lack of adequate sleep, possibly restless leg syndrome, and possible advanced sleep phase syndrome.  Tr. 1282, 1285.  Summers' sleep apnea was deemed to be clinically significant, warranting treatment.  Tr. 1286.

### *Mental health impairments*

Upon Nurse Foster-Geeter's referral, on December 27, 2017, Summers had a mental health assessment completed by Stacy Caldwell, Ph.D., at Metro Health.  Tr. 1056.  Summers' chief complaint was anxiety and depression.  Tr. 1056.  Summers relayed that she felt agitated and overwhelmed.  Tr. 1057.  She did not feel she had the strength to do things that needed to be done.  Tr. 1057.  She reported daily anxiety and difficulty sleeping – she worried about being able to take care of herself.  Tr. 1057.  On examination, Dr. Caldwell observed that Summers

was adequately groomed; her concentration was sustained; her behavior was described as "talkative"; her mood was depressed; her affect was congruent; her speech was pressured; her thought process was logical; she endorsed suicidal ideation but no plan of self-harm; she denied homicidal ideation; her cognition was within normal limits; her insight was fair; and her judgment was good.  Tr. 1059.  Dr. Caldwell's diagnosis was adjustment disorder with mixed anxiety and depression.  Tr. 1060.  Dr. Caldwell's recommendations included follow up for counseling and scheduling with a psychiatric provider.  Tr. 1060.

During a January 10, 2018, behavioral health counseling and therapy session, Summers reported having pain all over with concentrated pain behind her left knee.  Tr. 1065.  Dr. Caldwell observed that Summers was anxious; her thought process was logical and organized; her judgment and insight were good, fair; her recent and remote memory were within normal limits; her attention span and concentration was sustained; her mood was euthymic; and her affect was full range.  Tr. 1066.  Dr. Caldwell's impression was that Summers' symptoms were unchanged.  Tr. 1066.

Summers saw Parvathi Nanjundiah, M.D., on March 1, 2018, for a mental health assessment update with pharmacological management.  Tr. 1085-1090.  Summers reported that she felt her depression was less intense with Cymbalta.  Tr 1230.  However, she did not feel that the Trazodone was effective.  Tr. 1230.  Dr. Nanjundiah observed that Summers' gait was within normal limits.  Tr. 1090.  Summers' mood was noted to be depressed, anxious and she had a full affect.  Tr. 1090.  Summers was cooperative; her thought process was logical and organized; her attention/concentration was sustained; her recent and remote memory was within normal limits; her judgment and insight were good; there was no evidence of paranoia or delusions; and there were no suicidal or homicidal ideations.  Tr. 1090.  Dr. Nanjundiah's diagnostic impression was

dysthymia, generalized anxiety disorder.  Tr. 1090.  Dr. Nanjundiah started Summers on

Cymbalta for anxiety and depression and added Trazodone as needed for sleep.  Tr. 1091.

When Dr. Nanjundiah saw Summers on September 20, 2018, Summers' mental status

examination findings were similar to those observed during her March 2018 visit.  Tr. 1090,

1230.  Dr. Nanjundiah's diagnostic impression remained dysthymia, generalized anxiety

disorder.  Tr. 1230.  Dr. Nanjundiah increased Summers' Cymbalta and Trazodone.  Tr. 1231.

### 2.  Opinion evidence

*Consultative examiner (mental health impairment opinion)*

On April 5, 2017, Natalie M. Whitlow, Ph.D., completed a consultative psychological

evaluation.  Tr. 691-699.  Summers attended the evaluation and, at Summers' request, Summers'

aunt sat in during the evaluation "for moral support and the gathering of relevant information[.]"

Tr. 692.  Dr. Whitlow listed the following diagnoses: generalized anxiety disorder and

unspecified depressive disorder.  Tr. 696-697.

In the "summary and conclusions" section of her evaluation, Dr. Whitlow noted that

Summers "did report experiencing symptoms of depression and anxiety in her daily life[]"  Tr.

698.  However, Dr. Whitlow noted that Summers "did not identify experiencing any mental

health symptoms that impair her ability to effectively engage in the work world[]" and, also,

Summers indicated that her reported symptoms "[did] not impair her ability to effectively engage

in the work world."  Tr. 698.  Dr. Whitlow concluded her summary by stating, "the current

evaluator did not gather sufficient information to support concluding that her mental health

symptoms impair her ability to effectively engage in the work world."  Tr. 698.

Additionally, Dr. Whitlow found that Summers did not appear to have any limitations in

the four functional areas of understanding, remembering, and carrying out instructions;

17

maintaining attention and concentration, and in maintaining persistence and pace to perform

simple tasks and to perform multi-step tasks; responding appropriately to supervision and to

coworkers in a work setting; and responding appropriately to work pressures in a work setting.

Tr. 698.

*State agency reviewing consultants (mental health impairment opinions)*

On initial review, on April 18, 2017, state agency reviewing psychological consultant,

Bruce Goldsmith, Ph.D., completed a psychiatric review technique ("PRT"), finding that "[f]rom

a psychological point, Summers' conditions appear[ed] to be non[-]severe."  Tr. 85-86.  In

reaching his opinion, Dr. Goldsmith found that Summers had no limitation in her ability to

understand, remember or apply information or in her ability to interact with others and, he found

that Summers had mild limitation in her ability to concentrate, persist, or maintain pace and in

her ability to adapt and manage oneself.  Tr. 86.

On reconsideration, on August 5, 2017, state agency reviewing psychologist, Deryck

Richardson, Ph.D., completed a PRT.  Tr. 118-119.  Dr. Richardson agreed with Dr. Goldsmith's

opinion that Summers' mental conditions were non-severe.  Tr. 119.

*State agency reviewing consultants (physical impairment opinions)*

On initial review, on May 19, 2017, state agency reviewing consultant Linda Hall, M.D.,

completed a physical RFC assessment.  Tr. 87-90.  Dr. Hall opined that Summers had the RFC to

occasionally lift and/or carry 20 pounds and frequently lift and/or carry 10 pounds; stand and/or

walk for a total of about 6 hours in an 8-hour workday; sit for a total of about 6 hours in an 8-

hour workday; and push and/or pull "[u]nlimited, other than shown, for lift and/or carry[.]"  Tr.

88. Dr. Hall opined that Summers had the RFC to never climb ladders/ropes/scaffolds;

occasionally climb ramps/stairs and crawl; frequently stoop, kneel, and crouch; and balance

unlimitedly.  Tr. 88.  Dr. Hall explained that the postural limitations were due to Summers'

chronic back pain.  Tr. 88.  Dr. Hall also opined that, due to her chronic back pain, Summers

should avoid even moderate exposure to hazards.  Tr. 89-90.

On reconsideration, on August 5, 2017, state agency reviewing consultant, Steve E.

McKee, completed a physical RFC assessment.  Tr. 120-123.  Dr. McKee affirmed Dr. Hall's

findings.  Tr. 120-123.

**C.**     **Hearing testimony**

 **1.**     **Plaintiff's testimony**

Summers testified and was represented at the hearing.[6]  Tr.  37, 43-63.  Summers

explained that her sales job was difficult for her because it requires a lot of walking.  Tr. 50.  She

indicated that she is supposed to park her car in a particular area and walk to different businesses.

Tr. 50.  However, she is unable to manage all the walking so she drives from business to

business but doing so slows her down.  Tr. 50.  For example, she is supposed to see 100

prospective customers each day but she physically is unable to do so.  Tr. 50.  She estimated

seeing only four or five prospective customers each day.  Tr. 51.  She explained that, due to her

chronic pain, the weather can limit how many days she works each week.  Tr. 51.  Also, since

her surgery, Summers has a restricted airway that requires her to use an inhaler and it limits how

far she can walk.  Tr. 51, 56-57.  Although challenging, Summers indicated that she took the job

because she did not have money.  Tr. 57.

Summers relayed that she had her neck surgery on February 1, 2017.  Tr. 51-52.  When

asked why she decided to have her surgery, Summers indicated that, before her surgery, her feet

had been falling asleep.  Tr. 52.  Also, she had numbness and tingling in her hands and arms.  Tr.

---

[6] At a certain point during the hearing, the ALJ reminded Summers' counsel of the time.  Tr. 63.  Summers' counsel then stated "I don't have any other questions."  Tr. 63.

52.  Summers was also losing control of her bladder.  Tr. 53.  After some diagnostic testing, Summers' doctors informed her that her spinal cord was compressed behind her esophagus and she needed to have surgery or she would become paralyzed.  Tr. 52.  Summers was told that any damage to her feet and hands that had occurred prior to the surgery could not be reversed so, even after the surgery, Summers still has numbness and pain in her hands and feet.  Tr. 52.  She also still has some incontinence, which she thinks is now related to nerves in her lower back.  Tr. 53, 55.  She relayed that the benefit to having the surgery was "[n]ot being paralyzed."  Tr. 52.

Summers has really bad pain in her hands and they cramp.  Tr. 53.  She also has cramping in her legs and feet too.  Tr. 54.  They are trying to determine whether she has rheumatoid arthritis because it runs in the family.  Tr. 53.  She also continues to have severe weakness on her left side that she had before her surgery but "never got back."  Tr. 53.

In addition to other issues noted, Summers explained that she has muscle spasms and does not sleep well at night.  Tr. 62-63.  Also, her neck and low back problems make it difficult for her to sit for long periods of time.  Tr. 55-56.  She has to move around a lot and, when she stands up, she has to wait a few minutes before walking because her body locks up.  Tr. 55-56.  She feels like her neck is really heavy.  Tr. 56.  Her feet fall asleep.  Tr. 56.  Also, her left leg will give out if she does not watch it.  Tr. 56. Summers has a cane because she has fallen in the past.  Tr. 56.  Summers keeps her cane in her car all the time.  Tr. 56.

Summers tried land therapy but she explained that it was really painful because, as part of therapy, they pressed on her back which caused pressure on her lungs and she could not breathe.  Tr. 54.  Water therapy helped but once she got out of the water she was exhausted.  Tr. 54-55.

Summers did not think she would be able to work an eight-hour per day job because she cannot stand for too long and she cannot sit in one position for too long.  Tr. 57.  Summers

explained that doing anything too much or for too long causes her pain.  Tr. 58, 59.  She

estimated being able to stand for about 10-15 minutes before starting to feel pain.  Tr. 59.

Summers can carry a gallon of milk but would not be able to carry a gallon of milk in each hand.

Tr. 60.  After writing for about a minute, Summers has to take a break because her hands cramp

up.  Tr. 61.  She does not use a computer often.  Tr. 61.  Instead, she uses her phone but she has

to take breaks because she cannot hold her head down for long periods of time and she gets

cramps in her hands.  Tr. 61.

Summers takes Flexeril and Percocet for her pain.  Tr. 61-62.  She tried gabapentin but it

made her feel sick.  Tr. 61.  Summers took other medications, including blood pressure

medication, Cymbalta, and Trazadone.  Tr. 62.  Summers indicated she took the Trazadone for

sleep because she has severe anxiety at night.  Tr. 62.  Summers' medications "put [her] out."

Tr. 62.  She also uses a sleep apnea machine.  Tr. 62.  Summers said she did not have the sleep

apnea machine before her surgery.  Tr. 62.  Her doctor told her the sleep apnea issues had

something to do with the nerves in her neck.  Tr. 62.  When Summers is engaged in certain

activities, such as work or driving, and cannot take her pain medication, she uses ibuprofen.  Tr.

62.

### 2. Vocational expert's testimony

A Vocational Expert ("VE") testified at the hearing.  Tr. 63-66.  The VE described

Summers' past work as a home attendant to be a semi-skilled, medium level exertion job.[7]  Tr.

63.

For her first hypothetical, the ALJ asked the VE to assume an individual who could

engage in light exertional work but should never climb ladders, ropes, or scaffolds; could

---

[7] The ALJ indicated that she did not need the VE to describe Summers' sales rep position because she did not
consider it past relevant work and Summers was performing it part-time.  Tr. 63-64.

occasionally climb ramps and stairs; could frequently stoop, kneel, and crouch; could occasionally crawl; should avoid working around dangerous moving equipment or operating dangerous moving equipment such as power saws or jackhammers; no work in unprotected heights; and avoidance of concentrated exposure to extreme cold, humidity, and wetness.  Tr. 64.  The ALJ asked the VE whether there would be any work that the described individual could perform.  Tr. 64.  In response, the VE indicated that the described individual would be able to perform the following jobs: mail clerk, inspector and hand packager, and electronics worker.  Tr. 64.  The VE provided national job numbers for the three jobs identified.  Tr. 64.

For her second hypothetical, the ALJ asked the VE to add to the first hypothetical that the person would be off task 10 percent of the day.  Tr. 65.  The VE indicated that being off task 10 percent of the day was within an acceptable tolerance, explaining that up to 15 percent was acceptable.  Tr. 65.

For her third hypothetical, the ALJ asked the VE to add to the first hypothetical that the individual would come in late one day each month, leave early one day each month, and be absent one day each month on a regular and recurring basis.  Tr. 65.  The VE indicated that that additional limitation would be beyond acceptable tolerances.  Tr. 65.

In response to questioning by Summers' counsel, the VE indicated that there would be no jobs available if the individual described in the first hypothetical was capable of no more than 10 percent (which is below occasional) handling, fingering and feeling during an eight-hour workday.  Tr. 65-66.  Also, in response to further questioning by Summers' counsel, the VE indicated that there would be no work available if the individual could only occasionally handle, finger and feel and would occasionally need to use a cane for standing and walking.  Tr. 66.

22

### III. Standard for Disability

Under the Act, 42 U.S.C § 423(a), eligibility for benefit payments depends on the existence of a disability.  "Disability" is defined as the "inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months."  42 U.S.C. § 423(d)(1)(A).  Furthermore:

> [A]n individual shall be determined to be under a disability only if his physical or mental impairment or impairments are of such severity that he is not only unable to do his previous work but cannot, considering his age, education, and work experience, engage in any other kind of substantial gainful work which exists in the national economy . . . .

42 U.S.C. § 423(d)(2).

In making a determination as to disability under this definition, an ALJ is required to follow a five-step sequential analysis set out in agency regulations.  The five steps can be summarized as follows:

1. If the claimant is doing substantial gainful activity, he is not disabled.

2. If the claimant is not doing substantial gainful activity, his impairment must be severe before he can be found to be disabled.

3. If the claimant is not doing substantial gainful activity, is suffering from a severe impairment that has lasted or is expected to last for a continuous period of at least twelve months, and his impairment meets or equals a listed impairment, the claimant is presumed disabled without further inquiry.

4. If the impairment does not meet or equal a listed impairment, the ALJ must assess the claimant's residual functional capacity and use it to determine if the claimant's impairment prevents him from doing past relevant work.  If the claimant's impairment does not prevent him from doing his past relevant work, he is not disabled.

5. If the claimant is unable to perform past relevant work, he is not disabled if, based on his vocational factors and residual functional capacity, he is

capable of performing other work that exists in significant numbers in the national economy.

20 C.F.R. § 404.1520;[8]  *see also Bowen v. Yuckert*, 482 U.S. 137, 140-42, 96 L. Ed. 2d 119, 107 S. Ct. 2287 (1987).  Under this sequential analysis, the claimant has the burden of proof at Steps One through Four.  *Walters v. Comm'r of Soc. Sec.*, 127 F.3d 525, 529 (6th Cir. 1997).  The burden shifts to the Commissioner at Step Five to establish whether the claimant has the Residual Functional Capacity ("RFC") and vocational factors to perform work available in the national economy.  *Id.*

### IV. The ALJ's Decision

In her April 9, 2019, decision the ALJ made the following findings:[9]

1.    Summers meets the insured status requirements of the Social Security Act through March 31, 2020.  Tr. 17.

2.    Summers has not engaged in substantial gainful activity since February 1, 2017, the amended alleged onset date.  Tr. 17.

3.    Summers has the following severe impairments: cervical degenerative disc disease, lumbar degenerative disc disease, asthma, and obesity.  Tr. 18. Summers had non-severe impairments of depression (dysthymia), anxiety, and sleep apnea.  Tr. 18-21.

4.    Summers does not have an impairment or combination of impairments that meets or medically equals the severity of the listed impairments.  Tr. 21-22.

5.    Summers has the RFC to perform light work as defined in 20 C.F.R. § 404.1567(b) except she can never climb ladders, ropes or scaffolds; she can occasionally climb ramps and stairs; she can frequently stoop, kneel, crouch and occasionally crawl; she should avoid working around dangerous moving equipment or operating dangerous moving equipment

---

[8] The DIB and SSI regulations cited herein are generally identical.  Accordingly, for convenience, in most instances, citations to the DIB and SSI regulations regarding disability determinations will be made to the DIB regulations found at 20 C.F.R. § 404.1501 et seq.  The analogous SSI regulations are found at 20 C.F.R. § 416.901 et seq., corresponding to the last two digits of the DIB cite (i.e., 20 C.F.R. § 404.1520 corresponds with 20 C.F.R. § 416.920).

[9] The ALJ's findings are summarized.

such as power saws and jackhammers; she cannot perform work in unprotected heights; she must avoid concentrated exposure to extreme cold, humidity, and wetness. Tr. 22-26.

6.      Summers is unable to perform any past relevant work. Tr. 26-27.

7.      Summers was born in 1973 and was 42 years old, defined as a younger individual age 18-49, on the alleged disability onset date. Tr. 27.

8.      Summers has at least a high school education and is able to communicate in English. Tr. 27.

9.      Transferability of job skills is not material to the determination of disability. Tr. 27.

10.    Considering Summers' age, education, work experience, and RFC, there are jobs that exist in significant numbers in the national economy that Summers can perform, including mail clerk, inspector/hand packager, and electronics worker. Tr. 27-28.

Based on the foregoing, the ALJ determined that Summers had not been under a disability, as defined in the Social Security Act, from February 1, 2017, through the date of the decision. Tr. 28.

## V. Plaintiff's Arguments

First, Summers argues that the ALJ did not properly evaluate the evidence. Doc. 16, pp. 11-16. Within this first argument, Summers includes four sub-arguments, i.e., she asserts that the ALJ did not properly evaluate evidence regarding her mental health impairments; did not properly consider whether her physical impairments satisfied Listings 1.02 or 1.04; did not properly evaluate her obesity; and did not properly consider the effect of the combination of her impairments. Doc. 16, pp. 11-16, Doc. 21, pp. 1-2.

Second, Summers argues that the ALJ did not properly assess the credibility of her subjective allegations of pain. Doc. 16, pp. 16-19, Doc. 21, pp. 2-3.

Third, Summers argues that the ALJ did not satisfy her burden at Step Five because she did not include additional limitations in the VE hypothetical that the ALJ relied upon.  Doc. 16, pp. 20-21.

## VI. Law & Analysis

### A.      Standard of review

A reviewing court must affirm the Commissioner's conclusions absent a determination that the Commissioner has failed to apply the correct legal standards or has made findings of fact unsupported by substantial evidence in the record.  42 U.S.C. § 405(g); *Wright v. Massanari*, 321 F.3d 611, 614 (6th Cir. 2003).  "Substantial evidence is more than a scintilla of evidence but less than a preponderance and is such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Besaw v. Sec'y of Health & Human Servs.*, 966 F.2d 1028, 1030 (6th Cir. 1992) (quoting *Brainard v. Sec'y of Health & Human Servs.*, 889 F.2d 679, 681 (6th Cir. 1989).   The Commissioner's findings "as to any fact if supported by substantial evidence shall be conclusive."  *McClanahan v. Comm'r of Soc. Sec.*, 474 F.3d 830, 833 (6th Cir. 2006) (citing 42 U.S.C. § 405(g)).

A court "may not try the case *de novo*, nor resolve conflicts in evidence, nor decide questions of credibility."  *Garner v. Heckler*, 745 F.2d 383, 387 (6th Cir. 1984).  Even if substantial evidence or indeed a preponderance of the evidence supports a claimant's position, a reviewing court cannot overturn the Commissioner's decision "so long as substantial evidence also supports the conclusion reached by the ALJ." *Jones v. Comm'r of Soc. Sec.*, 336 F.3d 469, 477 (6th Cir. 2003).  When assessing whether there is substantial evidence to support the ALJ's decision, the Court may consider evidence not referenced by the ALJ.  *Heston v. Comm'r of Soc. Sec.*, 245 F.3d 528, 535 (6th Cir. 2001).

**B.     The undersigned recommends that the Court find that the ALJ properly evaluated the evidence.**

As noted above, within Summers' first argument, she raises four sub-arguments.  Each is addressed below.

**1.     ALJ's evaluation of Summers' mental health impairments**

Summers argues that the ALJ erred in her evaluation of her mental health impairments. Doc. 16, pp. 11-13, Doc. 21, p. 1.  Summers takes issue with the ALJ's determination that her mental health impairments, i.e., anxiety and depression, were non-severe impairments.

Where a "claimant's degree of limitation is none or mild, the Commissioner will generally conclude the impairment is not severe, 'unless the evidence otherwise indicates that there is more than a minimal limitation in [the claimant's] ability to do basic work activities.'" *Griffeth v. Comm'r of Soc. Sec.*, 217 Fed. Appx. 425, 2007 WL 444808, * 3 (6th Cir. Feb. 9, 2007) (citing 20 C.F.R. § 404.1520a(d)).  In this case, when assessing whether Summers' mental impairments were severe or not, the ALJ considered each of the four broad functional areas and concluded that Summers had no limitations in three functional areas – understanding, remembering or applying information; interacting with others; adapting or managing oneself – and a mild limitation in concentrating, persisting or maintaining pace.  Tr. 19-21.  In reaching her findings, the ALJ considered and relied upon the opinion of the consultative examiner, Dr. Whitlow, and the opinions of the state agency reviewing psychological consultants.  Tr. 19-21. While Summers is correct to note that Dr. Whitlow diagnosed Summers with generalized anxiety disorder and unspecified depressive disorder (Doc. 16, p. 11, Tr. 696-697), a diagnosis alone "says nothing about the severity of the condition."  *Higgs v. Bowen*, 880 F.2d 860, 863 (6th Cir. 1988).  Moreover, as Summers acknowledges, Dr. Whitlow opined that Summers had no functional limitations associated with her psychological impairments.  Doc. 16, p. 11, Tr. 697-

698.  Notwithstanding this acknowledgement, Summers contends that the ALJ erred because the ALJ did not discuss various mental health treatment records and because she assigned great weight to the opinions of the state agency consultants even though they did not have the entire record when they provided their opinions.  Doc. 16, p. 12.

An ALJ is not prohibited from assigning more weight to a non-examining physician.  *See e.g., Blakely v. Comm'r of Soc. Sec.*, 581 F.3d 399, 409 (6th Cir. 2009) ("In appropriate circumstances, opinions from State agency medical ... consultants ... may be entitled to greater weight than the opinions of treating or examining sources.") (quoting Soc. Sec. Rul. 96–6p, 1996 WL 374180, at *3 (July 2, 1996)).  "There is no categorical requirement that the non-treating source's opinion be based on a 'complete' or 'more detailed and comprehensive' case record." *See Helm v. Comm'r of Soc. Sec.*, 405 Fed. Appx. 997, 1002 (6th Cir. 2011).  "The opinions need only be 'supported' by evidence in the case record."  *Id.*   And, there must be "some indication that the ALJ at least considered" the later medical records.  *See Fisk v. Astrue*, 253 Fed. Appx. 580, 585 (6th Cir. 2007); *Blakely*, 581 F.3d at 409 (quoting *Fisk*, 253 Fed. Appx. at 585).

Here, when weighing the opinion evidence, the ALJ recognized that the state agency consultants' "opinions [were] based [only] on the record available at the time of their review." Tr. 20.  However, the ALJ also indicated she had "evaluated the record evidence as a whole[,]" Tr. 21.  Also, "an ALJ is not required to discuss all the evidence submitted, and an ALJ's failure to cite specific evidence does not indicate that it was not considered."  *Simons v. Barnhart*, 114 Fed. Appx. 727, 733 (6th Cir. Nov. 18, 2004) (internal citation and quotations omitted).

Additionally, it is Summers' burden to show the severity of her mental health impairments.  *Foster v. Sec'y of Health & Human Svcs.,* 899 F.2d 1221, *2, 1990 WL 41835 (6th Cir. Apr. 11, 1990) (unpublished) (citing *Murphy v. Sec'y of Health & Human Svcs.*, 801 F.2d

182, 185 (6th Cir. 1986). Yet, Summers has not explained how her participation in a weekly multidisciplinary outpatient psychotherapy group (Tr. 706), her mental health assessment (Tr. 1056-1062), or a handful of counseling sessions (Tr. 869, 872, 874, 1065-1068, 1085-1082) establishes that her anxiety and depression were severe impairments, i.e., that they caused more than a minimal limitation on her ability to perform basic work activities. For example, as Dr. Whitlow commented, Summers' "in-evaluation affect was stable and appropriate and she did not identify experiencing any mood-related issues that impair her ability to work[]" and Summers reported "experiencing anxiety symptoms in her daily life that are outside of the normative range of functioning but that have never and are not currently see[n] as impairing her ability to work." Tr. 695. Also, Summers points to nothing in the later-dated mental health records indicating work related or functional limitations connected with her mental health impairments or that her depression or anxiety cause more than a minimal limitation in her ability to perform basic work activities.

Considering the foregoing, the undersigned recommends that the Court find that the ALJ did not improperly evaluate the evidence pertaining to Summers' mental health impairments or err in finding that Summers' mental health impairments were not severe.

### 2. ALJ's evaluation of Summers' physical impairments under the Listings

Summers also contends that the ALJ did not properly consider whether her physical impairments satisfied Listings 1.02 or 1.04. Doc. 16, pp. 13-14, Doc. 21, pp. 1-2.

At Step Three of the disability evaluation process, a claimant will be found disabled if his impairment meets or equals one of the listings in the Listing of Impairments. 20 C.F.R. § 404.1520(a)(4)(iii). The claimant bears the burden of establishing that his condition meets or equals a Listing. *Thacker v. SSA*, 93 Fed. Appx. 725, 727-728 (6th Cir. Mar. 12, 2004) (citing

*Buress v. Sec'y of Health and Human Serv's.*, 835 F.2d 139, 140 (6th Cir. 1987)).  Thus, a claimant "must present specific medical findings that satisfy the various tests listed in the description of the applicable impairment or present medical evidence which describes how the impairment has such equivalency."  *Thacker* 93 Fed. Appx. at 728 (citing *Evans v. Sec'y of Health & Human Servs.*, 820 F.2d 161, 164 (6th Cir. 1987)).

At Step Three, when analyzing whether Summers' impairments or combination of impairments met or equaled one of the listed impairments, the ALJ observed that "[n]o treating or examining physician has indicated that the claimant has an impairment equivalent in severity to the criteria of any listed impairment in the Listing of Impairments."  Tr. 21.  Also, the ALJ noted that "neither the claimant nor her counsel contended that any of the severe impairments actually met or equaled a Listing."  Tr. 21, *see also* Tr. 43 ("I think that the step three is difficult in this case . . .") (Hearing Transcript, Summers' counsel's opening statement).  Notwithstanding the lack of opinion evidence and/or argument to support a finding that Summers' impairments satisfied a listing, in a detailed manner, the ALJ analyzed Summers' impairments under various listings, including 1.02 and 1.04.  Tr. 21-22.  In the end, the ALJ concluded that Summers did not have an impairment or combination of impairments that met or equaled the criteria for any listed impairment.  Tr. 21-22.

In this appeal, Summers contends that the ALJ's Step Three finding is faulty and subject to reversal because she ignored evidence that Summers continued to complain of pain and numbness following her surgery and that she complained of burning in her feet and appeared to be in severe pain.  Doc. 16, p. 13, Doc. 21, pp. 1-2.  However, the ALJ did not ignore evidence regarding post-surgical reports of pain or numbness.  *See e.g.*, Tr. 23, 25.  Also, "an ALJ is not

required to discuss all the evidence submitted, and an ALJ's failure to cite specific evidence does not indicate that it was not considered." *Simons*, 114 Fed. Appx. at 733.

Even assuming arguendo that the records that Summers points to demonstrate that she lodged those complaints and/or appeared to be in severe pain at some point in time, she fails to explain how the evidence establishes that she meets each of the criteria in Listing 1.02 or Listing 1.04. *Thacker* 93 Fed. Appx. at 728 (A claimant "must present specific medical findings that satisfy the various tests listed in the description of the applicable impairment or present medical evidence which describes how the impairment has such equivalency."). In explaining her Step Three finding relative to Listing 1.02 and Listing 1.04, the ALJ stated in part:

> Otherwise, her record does not indicate gross anatomical deformity and chronic joint pain and stiffness with signs of limitation of motion or other abnormal motion of the affected joints. There was no involvement of one major peripheral weight-bearing joint resulting in inability to ambulate effectively or in involvement of one major peripheral joint in an upper extremity resulting in inability to perform fine and gross movements effectively. Moreover, her record did not indicate post-surgical nerve root compression  characterized by neuro-anatomic distribution of pain, limitation of motion of the spine, motor loss (atrophy with associated muscle weakness or muscle weakness) accompanied by sensory or reflex loss and positive straight-leg raising. There was also no spinal arachnoiditis or lumbar spinal stenosis resulting in pseudoclaudication.

Tr. 22.  Summers has failed to demonstrate that the ALJ's Step Three finding is unsupported by substantial evidence.  The undersigned finds that Summers's Step Three argument is conclusory and amounts to a request that the Court consider the evidence de novo.  However, that is not this Court's role.  *Garner*, 745 F.2d at 387 (A court "may not try the case *de novo*, nor resolve conflicts in evidence, nor decide questions of credibility.").  And, even if substantial evidence or indeed a preponderance of the evidence supports a claimant's position, a reviewing court cannot overturn the Commissioner's decision "so long as substantial evidence also supports the conclusion reached by the ALJ." *Jones*, 336 F.3d at 477.

31

For the reasons explained herein, the undersigned recommends that the Court find that the ALJ did not err at Step Three.

### 3. ALJ's evaluation of Summers' obesity

Summers contends that the ALJ failed to consider Summers' obesity in combination with her other impairments.  Doc. 16, pp. 14-15.

SSR 02-1p, *Evaluation of Obesity*, 2002 WL 34686281 (Sept. 12, 2002), provides that obesity will be considered by an ALJ in assessing a claimant's disability claim.  However, SSR 02-1p does not establish a particular formula or method for evaluating obesity at each of the sequential steps in the evaluation process.  *See Bledsoe v. Barnhart*, 165 Fed. Appx. 408, 411-412 (6th Cir. Jan. 31, 2006) ("Social Security Ruling 02-01p does not mandate a particular mode of analysis."); *see also Nejat v. Comm'r of Soc. Sec.*, 359 Fed. Appx. 574, 577 (6th Cir. Dec. 22, 2009) ("'Social Security Ruling 02-01p does not mandate a particular mode of analysis,' but merely directs an ALJ to consider the claimant's obesity, in combination with other impairments, at all stages of the sequential evaluation.") (quoting and relying on *Bledsoe*, 165 Fed. Appx. at 411-412).

Summers asserts that "The combination of the obesity and Plaintiff's impairments would have precluded her from standing/walking for six hours a day as required by work at the light level of exertion."  Doc. 16, p. 15.  She fails to identify evidence to support her conclusory argument.   Moreover, she has not shown that the ALJ failed to account for or consider her obesity under SSR 02-01p.  Rather, the ALJ found obesity to be one of Summers' severe impairments and she discussed evidence regarding Summers' obesity.  Tr. 18, 26.  Additionally, the ALJ explained:

> Since the evidence indicates the claimant was obese, the undersigned carefully considered Social Security Ruling 02-1p, which discusses obesity and its potential

for causing or contributing to other impairments. Consequently, the exertional, environmental, and postural limitations described in the residual functional capacity above include consideration of the claimant's obesity.

Tr. 26.

As indicated above, there is no specific formula that an ALJ is required to utilize when considering a claimant's obesity. Summers has not identified or provided a medical opinion to support her claim that her obesity, in combination with her other impairments, supports a more restrictive RFC. Furthermore, the Regulations make clear that a claimant's RFC is an issue reserved to the Commissioner and the ALJ assesses a claimant's RFC "based on all the relevant evidence" of record. 20 C.F.R. §§ 404.1545(a); 20 C.F.R. § 404.1546(c). Summers has not shown that the ALJ failed to comply with these Regulations nor has she shown that the ALJ failed to consider Simpson's obesity in accordance with SSR 02-1p. Accordingly, the undersigned recommends that the Court reject Summers' claim that the ALJ erred in her assessment or consideration of Summers' obesity.

### 4. ALJ's evaluation of the combination of Summers' impairments

As an additional or possibly as a supplemental argument to her obesity argument, Summers argues that the ALJ erred in her evaluation of the evidence because the ALJ did not properly consider the effect of the combination of her physical and psychological impairments when assessing an RFC with a light level of exertion. Doc. 16, pp. 15-16. Summers argument is again conclusory and without merit.

"In the Sixth Circuit, courts have held that 'an ALJ's finding that a claimant's combination of impairments (plural) did not meet or equal the Listings is sufficient to show that the ALJ had considered the effect of the combination of impairments,' so long as the ALJ has 'conducted sufficient analyses of each of the claimants' impairments after carefully

considering the entire record.'" *Malave v. Saul*, 2019 WL 5552614, at *13 (N.D. Ohio Oct. 22, 2019), *report and recommendation adopted,* 2019 WL 5552613 (N.D. Ohio Oct. 28, 2019) (quoting *Ridge v. Barnhart*, 232 F. Supp. 2d 775, 789 (N.D. Ohio 2002), citing *Gooch v. Sec'y of Health and Human Servs.*, 833 F.2d 589, 592 (6th Cir. 1987); *Loy v. Sec'y of Health and Human Servs.*, 901 F.2d 1306, 1310 (6th Cir. 1990)) (finding that the ALJ adequately considered the combined effect of claimant's impairments; reversing on other grounds).

Here, the ALJ stated that Summers' "does not have an impairment or combination of impairments that meets or medically equals the severity of one of the listed impairments[.]" Tr. 21 (emphasis supplied). Furthermore, when assessing Summers' RFC, the ALJ considered both the severe and non-severe impairments. Tr. 22-26 (noting/discussing sleep apnea, asthma, depression, anxiety, cervical and lumbar degenerative disc disease, and obesity). Summers has failed to demonstrate that the ALJ did not consider the effect of the combination of her impairments or that the ALJ did not consider the entirety of the record. For these reasons, the undersigned recommends that the Court reject Summers' claim that the ALJ did not properly consider the combination of Summers' impairments.

**C.      The undersigned recommends that the Court find that the ALJ did not err in her assessment of the credibility of Summers' subjective allegations.**

Summers argues that the ALJ did not properly assess the credibility of her subjective allegations. Doc. 16, pp. 16-19, Doc. 21, pp. 2-3.

A claimant's statements of symptoms alone are not sufficient to establish the existence of a physical or mental impairment or disability. 20 C.F.R. § 40415929(a); SSR 16-3p, 2017 WL 5180304. When a claimant alleges impairment-related symptoms, a two-step process is used to evaluate those symptoms. 20 C.F.R. § 4004.1529(c); 2017 WL 5180304, * 2-8.

First, a determination is made as to whether there is an underlying medically determinable physical or mental impairment that could reasonably be expected to produce the claimant's symptoms, *e.g.*, pain. SSR 16-3p, 2017 WL 5180304, * 3-4. Second, once the foregoing is demonstrated, an evaluation of the intensity and persistence of the claimant's symptoms is necessary to determine the extent to which the symptoms limit the claimant's ability to perform work-related activities. *Id.* at * 3, 5-8. To evaluate a claimant's subjective symptoms, an ALJ considers the claimant's complaints along with the objective medical evidence, information from medical and non-medical sources, treatment received, and other evidence. SSR 16-3p, 2017 WL 5180304, * 5-8. In addition to this evidence, the factors set forth in 20 C.F.R. 416.929(c)(3) are considered. *Id.* at *7-8. Those factors include daily activities; location, duration, frequency, and intensity of pain or other symptoms; factors that precipitate and aggravate the symptoms; type, dosage, effectiveness, and side effects of any medication taken to alleviate pain or other symptoms; treatment, other than medication for relief of pain or other symptoms; measures other than treatment a claimant uses to relieve pain or other symptoms, *e.g.*, lying flat on one's back; and any other factors pertaining to a claimant's functional limitations and restrictions due to pain or other symptoms. *Id.* The ALJ's decision "must contain specific reasons for the weight given to the individual's symptoms, be consistent with and supported by the evidence, and be clearly articulated so the individual and any

subsequent reviewer can assess how the adjudicator evaluated the individual's symptoms."  *Id*. at * 10.

An ALJ's findings based on the credibility of the applicant are to be accorded great weight and deference, particularly since an ALJ is charged with the duty of observing a witness's demeanor and credibility.  Nevertheless, an ALJ's assessment of a claimant's credibility must be supported by substantial evidence."  *Calvin v. Comm'r of Soc. Sec.*, 437 Fed. Appx. 370, 371 (6th Cir. 2011) (citing *Walters v. Comm'r of Soc. Sec.*, 127 F.3d 525, 531 (6th Cir. 1997)).

The ALJ considered Summers' subjective complaints but concluded that her "statements concerning the intensity, persistence and limiting effects of these symptoms are not entirely consistent with the medical evidence and other evidence in the record for the reasons explained in the decision."  Tr. 23.  In reaching this conclusion, Summers contends that the ALJ failed to mention evidence that supported Summers' "credibility about her symptoms[]" and failed to provide sufficient analysis.  Doc. 16, p. 19.  She asserts that her subjective complaints of pain in her hands, lower back, and legs; incontinence; inability to perform activities for more than 10 or 15 minutes at a time; and that she was exhausted all the time are supported by objective medical evidence.  Doc. 16, p. 18.  Specifically, she points to a July 2017 lumbar MRI and November 29, 2018, sensory examination showing tingling sensation in the dermatomal regions of her upper extremities and findings of spondylogenic neck pain as well as limited range of motion, lumbar stenosis and incontinence. Doc. 16, p. 18 (citing Tr. 851, 1301).  However, the ALJ considered this evidence.  Tr. 21, 24 (citing Exhibit 9F/28 (Tr. 851, July lumbar MRI)),[10] Tr. 25 (noting new symptom of incontinence as well as limited range of motion with sensory dysfunction, citing Exhibit 18F/27 (Tr. 1301, November 29, 2018, treatment record from office visit with Nurse

---

[10] The ALJ states at one point that the MRI was taken in June 2017.  Tr. 21.  However, the cited record is a July 2017 MRI.  Tr. 851 (Exhibit 9F/28).

Stevens)).  Thus, Summers' claim that the ALJ disregarded evidence when assessing the credibility of her subjective allegations regarding the limiting effect of her symptoms is inaccurate.[11]

Here, the ALJ considered the evidence of record, including evidence that Summers points to in support of her claim, but did not find Summers' allegations entirely credible.  As explained by the ALJ, the evidence also showed normal examination findings, including findings that Summers was neurologically intact; she had intact reflexes, normal strength, ability to heel/toe/tandem walk without difficulty; she had normal gait; and she had started to work a part-time job that involved a lot of walking.  Tr. 21, 24, 25.  It is not this Court's role to "try the case *de novo*, nor resolve conflicts in evidence, nor decide questions of credibility."  *Garner*, 745 F.2d at 387.  Moreover, Summers has not shown that the ALJ's assessment of her subjective complaints is unsupported by substantial evidence.  Thus, even if evidence that Summers points to supports her position, reversal is not warranted.  *Jones*, 336 F.3d at 477.  (Even if substantial evidence or indeed a preponderance of the evidence supports a claimant's position, a reviewing court cannot overturn the Commissioner's decision "so long as substantial evidence also supports the conclusion reached by the ALJ.").

Considering the foregoing, the undersigned finds that Summers has not shown that the ALJ ignored evidence when assessing Summers' subjective allegations nor has she shown that the ALJ did not sufficiently explain her analysis.  Accordingly, the undersigned recommends that

---

[11]Summers inserts into her credibility assessment argument, the following statement: "In addition, it should be noted that the ALJ pointed out the time to Plaintiff's Attorney which resulted in him stopping his questioning (Tr. 63). These errors should result in this matter being remanded."  Doc. 16, p. 19.  While it is correct that the ALJ informed Summers' counsel of the time while counsel was questioning Summers, there is no indication that the ALJ indicated that counsel was required to cease his line of questioning.  Moreover, Summers fails to explain or demonstrate that the ALJ's statement to counsel regarding what time it was shows that the decision is not supported by substantial evidence or that reversal or remand is warranted.

the Court find no error with respect to the ALJ's assessment of Summers' subjective allegations of her symptoms.

**D.    The undersigned recommends that the Court find the Step Five determination supported by substantial evidence.**

Summers argues that the ALJ did not satisfy her burden at Step Five because she did not include additional limitations in the VE hypothetical that the ALJ relied upon.  Doc. 16, pp. 20-21.

An ALJ is responsible for assessing a claimant's RFC.  *See* 20 C.F.R. § 404.1546(c); *Poe v. Comm'r of Soc. Sec.*, 342 Fed. Appx. 149, 157 (6th Cir. Aug. 18, 2009).  While Summers contends that the ALJ should have assessed a more restrictive RFC, she has not shown that the light exertional RFC is unsupported by substantial evidence.  Also, as explained herein, she has not shown that the ALJ erred in her evaluation of the evidence or when assessing Summers' subjective allegations regarding her symptoms.

To satisfy his burden at Step Five, the Commissioner must make "a finding supported by substantial evidence that [plaintiff] has the vocational qualifications to perform specific jobs." *Varley v. Sec'y of Health & Human Servs.*, 820 F.2d 777, 779 (6th Cir. 1987) (quoting *O'Banner v. Secretary of Health, Education & Welfare*, 587 F.2d 321, 323 (6th Cir. 1978)(alteration in original).  "Substantial evidence may be produced through reliance on the testimony of a vocational expert in response to a 'hypothetical' question[].]"  *Id.* (internal citation omitted). Here, to support her Step Five determination, the ALJ relied upon VE testimony in response to a hypothetical question that reflected the limitations contained in the ALJ's ultimate RFC assessment.

Considering the foregoing, the undersigned recommends that the Court find that the ALJ's Step Five determination is supported by substantial evidence.

## VII. Recommendation

For the foregoing reasons, the undersigned recommends that the Court **AFFIRM** the

Commissioner's decision.

June 24, 2021

*/s/ Kathleen B. Burke*
Kathleen B. Burke
United States Magistrate Judge

## <u>OBJECTIONS</u>

Any objections to this Report and Recommendation must be filed with the Clerk of Courts within fourteen (14) days after the party objecting has been served with a copy of this Report and Recommendation.  Failure to file objections within the specified time may waive the right to appeal the District Court's order.  See *United States v. Walters*, 638 F.2d 947 (6th Cir. 1981).  *See also Thomas v. Arn*, 474 U.S. 140 (1985), *reh'g denied*, 474 U.S. 1111 (1986).