UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF OHIO
------------------------------------------------------------

NARKITA J. SUMMERS,                                :
                                                   :            Case No. 1:20-cv-1280
                 Plaintiff,                        :
                                                   :            OPINION & ORDER
                                                   :            [Resolving Docs. 22, 23 & 24]

vs.                                                :
                                                   :
COMMISSIONER OF                                    :
SOCIAL SECURITY ADMINISTRATION,                                    :
                                                   :
                 Defendant.                        :
------------------------------------------------------------

JAMES S. GWIN, UNITED STATES DISTRICT JUDGE:

On June 11, 2020, Plaintiff Narkita Summers filed a complaint seeking judicial review of Defendant Commissioner of Social Security's decision to deny her supplemental security income and disability insurance benefits.[1]  The Court referred the matter to Magistrate Judge Kathleen B. Burke.

On June 24, 2021, Magistrate Judge Burke issued a Report and Recommendation ("R&R") recommending that this Court affirm the Commissioner's decision.[2]  Plaintiff Summers objects to the R&R,[3] and the Commissioner replies.[4]  For the reasons stated below, this Court **OVERRULES** the Plaintiff Summers' objections, **ADOPTS** the R&R, and **AFFIRMS** the Commissioner's decision.

## I.        BACKGROUND

The Court recounts the R&R's thorough summary of the record here.

---

[1] Doc. 1.
[2] Doc. 22.
[3] Doc. 23.
[4] Doc. 24.

Case No. 1:20-cv-1280
Gwin, J.

In October 2016, Summers saw Dr. Samuel Rosenberg, M.D., in the
neurosurgery department at Metro Health. Tr. 378-380. Dr. Rosenberg noted
that Summers presented with a10-year history of low back pain with no
traumatic event; numbness/tingling in her bilateral lower extremities for two
months; reports of back locking up with standing; urinary urgency but denial
of urinary/bowel incontinence; complaints of neck/shoulder pain with
paraesthesia in the hands bilaterally; and reports of weakness and numbness
throughout her dominant left hand.  Tr. 378.

On physical examination, Dr. Rosenberg observed a normal gait; severe
weakness with left bicep and mild weakness with right extensor hallucis
longus; decreased sensation in the left hand; deep tendon reflexes were
hyperreflexic; and negative straight leg raise. Tr. 380. Dr. Rosenberg's
impression was left C6 radiculopathy with myelopathy and right L5
radiculopathy. Tr. 380. Dr. Rosenberg ordered a cervical and lumbar MRI,
noting that he was not comfortable sending Summers to physical therapy
without getting an MRI. Tr. 380. He prescribed a trial of Neurontin
(gabapentin). Tr. 380.

Summers had her MRI and, on December 13, 2016, she saw Dr. Rosenberg
along with Dr. Timothy Moore, M.D., in the orthopedics department at
Metro Health to talk about the cervical MRI results, which showed
"[m]oderate to severe multifocal cord compression secondary to spondylosis"
(Tr. 512-513). Tr. 510. On physical examination, Dr. Moore observed that
Summers was "a little bit . . . weak in her left upper extremity, may be 5-/5 in
her biceps and brachial radialis." Tr. 510.  Summers was "hyperreflexic
throughout." Tr. 510.  She had "significant Hoffman sign bilaterally, she
[had] a Lhermitte sign." Tr. 510. Summers did "[o]kay with tandem walking,"
but she was "a little bit clumsy." Tr. 510. Dr. Moore's impression was
"severe cervical spondylosis, severe cord compression." Tr. 511. Dr. Moore
indicated that he offered Summers surgery at her earliest convenience to stop
the progression of what was occurring. Tr. 511. He noted, however, that
there was no guarantee that Summers would be better following the surgery.
Tr. 511.

Summers decided to proceed with surgery. Tr. 364. Prior to the surgery,
Summers had a CT scan of the spine that showed "[m]ulitlevel degenerative
changes and congenital narrowing[]." Tr. 588-589. Also, prior to her
surgery, she met with Dr. Moore on January 26, 2021. Tr. 364. During that visit, Dr.
Moore noted Summers "ha[d] a large C6-7 disk complex causing cord
compression that [wa]s soft disk herniation."  Tr. 364.

On February 1, 2017, Dr. Moore performed surgery (Tr. 540-544), which
consisted of "extensive anterior-posterior cervical decompression and

-2-

Case No. 1:20-cv-1280
Gwin, J.

reconstruction for severe spinal cord compression, myelopathy with C6-7
anterior cervical diskectomy and fusion, posterior cervical laminoplasty and
fusion C3-C7[.]" (Tr. 540-544). Summers was discharged on February 3,
2017. Tr. 471.

Summers saw Dr. Moore on February 14, 2017, for her first appointment
following her discharge. Tr. 494-495. Summers was doing "very well[]" and
her "[s]welling issues [were] greatly improved." Tr. 495. Summers
"remain[ed] neurologically intact." Tr. 495.

Summers saw Dr. Moore again on March 28, 2017. Tr. 493. She reported
"having a pretty rough time." Tr. 493. She was experiencing "burning in her
feet," with "varying symptoms in her hands." Tr. 493. However, she did
report that "her posterior neck pain [was] getting significantly better[]" and
she had "[n]o bowel or bladder symptoms." Tr. 493. On examination, Dr.
Moore indicated that Summers "remain[ed] neurologically intact[.]" Tr. 493.
However, she was "still hyperreflexic[.]" Tr. 493. Dr. Moore's impression
was that Summers was "doing okay now at 7 weeks." Tr. 493. A cervical
spine x-ray (lateral only) taken on March 28, 2017, showed "[n]o evidence of
any postsurgical complication[.]" Tr. 580.

During an April 11, 2017, primary care visit for complaints of abdominal
pain, Summers continued to report pain and burning in her hands and feet.
Tr. 489. Her gait was normal, and her coordination was intact. Tr. 491.

On May 9, 2017, cervical spine x-rays (flexion and extension views) were
taken. Tr. 572. The x-rays showed "some limited range of motion[]" but "[n]o
pathological subluxation [was] identified." Tr. 572. Also, on May 9, 2017,
Summers saw Dr. Moore. Tr. 482. Summers indicated that she was "very
miserable, more miserable than expected 3 months after [surgery]." Tr. 482.
She relayed that "she just [did] not feel well[]" and she was "not sleeping at
night and wanted something to sleep." Tr. 482. Dr. Moore observed that
Summers "remain[ed] neurologically intact[]" and he noted there were no
issues showing on the flexion and extension views of her cervical spine. Tr.
482. Dr. Moore's impression was that Summers was "doing okay at 3
months." Tr. 483. He wrote Summers a prescription for therapy; refilled her
pain medications one last time; and provided her a prescription for Flexeril.
Tr. 483. He suggested that Summers see her primary care physician and
consider lab work to see if something else was going on. Tr. 483. Dr.
Moore also instructed Summers to continue with her exercises. Tr. 483.

On May 18, 2017, Summers saw Tyecia Stevens, CNP, in the Physical
Medicine and Rehabilitation (PM&R) Clinic at Metro Health regarding her
neck pain. Tr. 723-727. Summers reported "feeling worse than before [her]

Case No. 1:20-cv-1280
Gwin, J.

surgery."  Tr. 724.  Summers indicated that her shoulder blades burned; she had shooting pain down her neck; she had good and bad days; and her pain was worse in the evenings. Tr. 724. Summers also indicated that she was "a bit depressed because the after effect [was] taking a tol[l] on her."  Tr. 724. Also, she had no income and others did not understand what she was going through. Tr. 724. Summers complained of "breathing disturbance[.]" Tr. 724. Summers tried gabapentin but it made her sick. Tr. 724. She was taking Percocet and it took "the edge off[.]"  Tr. 724.

Summers' symptoms were disturbing her sleep. Tr. 724. On examination, Summers had moderately decreased range of motion and tenderness in her neck; there was no evidence of spasm, no evidence of trigger points and Spurling's maneuver was negative. Tr. 727. The neurological examination showed that Summers' reflexes were 2+ in the bilateral upper extremities; negative Hoffman bilaterally; tingling in the dermatomal regions of the bilateral upper extremities; motor strength was normal in the myotomal regions of the bilateral upper extremities; fine motor coordination was normal; and Summers was able to heel walk, toe walk, and tandem gait without difficulty. Tr. 727.  Ms. Stevens recommended physical therapy for her cervical and lumbar spine; discontinuation of gabapentin; and a refill of Percocet while Summers was in physical therapy. Tr. 727.

Summers started physical therapy on May 25, 2017. Tr. 719. Summers reported that she stayed in bed most of the time because her neck was painful and she was easily fatigued.  Tr. 719. She also reported upper extremity and cervical pain and weakness as well as difficulty with walking, balancing and stairs.  Tr. 719.  Summers indicated that she was performing some cervical active range of motion. Tr. 719. Summers' reported pain level was 0/10 at rest and 6/10 with movement in the cervical spine, bilateral subscapular.  Tr. 721.  Summers ambulated into the office "with guarded posture wearing wedges flip-flops[.]"  Tr. 721.

During a May 30, 2017, visit with Dr. Rosenberg, Summers complained mostly of "right leg pain associated wit[]h intermittent foot drop and dense numbness right foot[.]" Tr. 719. Dr. Rosenberg noted that Summers "appear[ed] to be in severe pain[.]" Tr. 719. She had an antalgic gait, numbness and weakness in her left lower extremity, and a positive straight leg raise on the left. Tr. 719. Dr. Rosenberg ordered an MRI.  Tr. 719.

During a physical therapy visit on June 7, 2017, with physical therapist Andrea Gonzalez, Summers continued to report that she stayed in bed most of the time because her neck was painful and she was easily fatigued.  Tr. 716. She also reported upper extremity and cervical pain and weakness as well as difficulty with walking, balancing and stairs. Tr. 716. Summers

-4-

Case No. 1:20-cv-1280
Gwin, J.

indicated that she was performing some cervical active range of motion. Tr. 716. Ms.

Gonzalez's assessment was that Summers presented with moderate neck pain with cervical range of motion restrictions. Tr. 718. Ms. Gonzalez explained to Summers the importance of improving her cervical range of motion and posture control. Tr. 718.

In July 2017, Summers attended another physical therapy session (Tr. 706-709) and she participated in weekly psychotherapy outpatient group sessions that were focused on chronic pain rehabilitation (Tr. 706, 838).

Summers saw Ms. Stevens again on July 20, 2017. Tr. 834-838. Summers reported feeling "terrible." Tr. 834. She was getting an updated MRI of her lumbar spine to determine whether her herniated disc was bigger. Tr. 834. Summers relayed that her lower extremities were worse than her neck. Tr. 834. She was attending physical therapy and it was helping – she was not as stiff. Tr. 834. She still had radicular symptoms down her arms. Tr. 834. Physical examination findings were similar to those from Summers' May 2017 visit with Ms. Stevens. Tr. 837. Ms. Stevens recommended that Summers continue with physical therapy, home exercises, and "therapy and groups[.]" Tr. 837. Also, she recommended use of Percocet while in physical therapy but not for chronic use. Tr. 837.

An MRI of the lumbar spine taken on July 31, 2017 (Tr. 851-852), showed "[l]ower lumbar degenerative change with a broad-based bulging disk at L5-S1, facet hypertrophy and moderate resultant stenosis with compression of the thecal sac." (Tr. 852). There were "[s]imilar findings to a lesser degree at L4-5[;] [n]o large disc extrusion[;] [and] [n]o findings of vertebral metastasis or occult fracture." Tr. 851.

Summers saw Dr. Rosenberg on August 4, 2017. Tr. 995-996. Summers complained of back and bilateral leg weakness and numbness and she reported that she could barely stand up. Tr. 996. Summers also indicated that she could only walk for a few minutes and she had left- sided neck pain. Tr. 996. On examination, Dr. Rosenberg observed that Summers looked "sleepy and in pain[]." Tr. 996. She had "[n]o lower extremity weakness nor numbness[.]" Tr.996. She had "weak finger extensors and flexors[.]" Tr. 996. Hoffman's were positive. Tr.996. Dr. Rosenberg recommended an interlaminar epidural steroid injection at L4-5 and L5-S1.Tr. 996.

On August 15, 2017, Summers had an x-ray of the cervical spine (flexion and extension views). Tr. 1006-1007. The x-ray showed that Summers' alignment and hardware were intact. Tr. 1006-1007. Also, on August 15, 2017,

Case No. 1:20-cv-1280
Gwin, J.

Summers saw Dr. Moore.  Tr. 1002-1003.  Dr. Moore noted that Summers
"look[ed] much better[,]" noting that "she was in pretty significant
postoperative misery."  Tr. 1002.  Dr. Moore noted also that Summers had
been seeing Dr. Rosenberg for low back issues. Tr. 1002. On examination,
Dr. Moore observed that Summers' incisions were "healing appropriately";
she "remained neurologically intact"; and "[h]er dysesthetic hands [were]
subjectively improved." Tr. 1002. Dr. Moore indicated that the cervical spine
x-rays showed no issues. Tr. 1002. Dr. Moore's impression was that
Summers was "doing well now at 7 months." Tr. 1003. Dr. Moore advised
that it was okay for Summers to proceed with conservative treatment for her
low back, but he did not want her to have any cervical injections until she
was one year post-op. Tr. 1003. Dr. Moore recommended repeat cervical
spine x-rays in February. Tr. 1003.

On October 27, 2017, Summers saw one of her primary care providers,
Sharon Foster-Geeter, APRN-CNP, for follow up regarding complaints of
increased shortness of breath with any kind of activity. Tr. 1008. Summers
relayed that she was continuing to attend physical therapy but she now had
lower back pain that radiated into her left leg and feet. Tr. 1008. On
examination, Nurse Foster-Geeter observed a normal gait, intact
coordination, upper extremity weakness, limited range of motion in the neck,
and normal mood and affect.  Tr. 1011.

Identified diagnoses included essential hypertension; osteoarthritis of cervical
spine with myelopathy; osteoarthritis of spine with radiculopathy, lumbar
region; shortness of breath; depression, unspecified depression type; and
anxiety. Tr. 1012. Nurse Foster-Geeter entered an arthritis service request
and a psychiatry service request. Tr. 1012. She also ordered pulmonary
function testing (Tr. 910-911, 1012) and a chest x-ray for the shortness of
breath (Tr. 1012, 1014,1016). The chest x-ray that Nurse Foster-Geeter
ordered showed "no acute cardiopulmonary findings."  Tr. 1016. The
pulmonary function testing was "consistent with a moderate obstructive
ventilatory defect without a significant response to inhaled bronchodilators,
with airtrapping." Tr. 911. Also, it was indicated that the "findings may be
consistent with a diagnosisof asthma and methacholine challenge may be
useful.  Clinical correlation is needed."  Tr. 911.

Also, on October 27, 2017, upon Nurse Foster-Geeter's referral, Summers
saw Dr. Choung Cho Yue, M.D., for a rheumatology consult. Tr. 1018-1022.
Dr. Yue noted that Summers had spine surgery in February and, she was now
having pain in her hips and knees and her feet were falling asleep. Tr. 1018.
Summers reported tingling in her fingers, trouble opening pill bottles, and
morning stiffness in her hips. Tr. 1018.  She did not report swelling.  Tr.
1018. On examination, Summers had full range of motion in her neck,

-6-

Case No. 1:20-cv-1280
Gwin, J.

shoulders, elbows, wrists, hips, and ankles; her grip strength was 4+/4+. Tr. 1021. Dr. Yue observed no tenderness, swelling, or pain during the examination. Tr. 1021. Dr. Yue's assessment was: "problem not at all inflammatory in character. There is plenty of findings of degenerative changes for which there is no disease modifying therapy." Tr. 1022. Dr. Yue encouraged Summers to exercise but Summers indicated "she hurts too much." Tr. 1022. Dr. Yue also suggested that Summers return to physical medicine and indicated that there was no need for follow up with rheumatology. Tr. 1022.

Summers saw Nurse Stevens on November 2, 2017. Tr. 1033. Summers complained of neck pain. Tr. 1033. She relayed that she could not tolerate land therapy—the exercises were too hard and hurt. Tr. 1033. However, she was interested in aquatic therapy. Tr. 1038.

Summers reported having breathing issues and bilateral lower extremity pain that was secondary to her lumbar stenosis. Tr. 1033. Nurse Stevens noted that Summers' cervical exam revealed a limited range of motion; tenderness; no evidence of spasms or trigger points; and Spurling's maneuver was negative. Tr. 1038. The neurological exam showed normal reflexes in the upper extremities; negative Hoffman bilaterally; tingling in the upper extremities; normal motor strength in the upper extremities; normal fine motor coordination; and ability to heel walk, toe walk and tandem gait without difficulty. Tr. 1038. Nurse Stevens provided Summers with a prescription for aquatic therapy. Tr. 1038. She refilled Summers' Percocet prescription, to be used while in physical therapy, not for chronic use. Tr. 1038.

On November 14, 2017, Summers started physical therapy again. Tr. 933-941, 942-945. At her November 14, 2017, physical therapy evaluation, Summers complained of difficulty walking due to her lumbar stiffness, neck stiffness, spinal stenosis, and asthma. Tr. 933. She also reported weakness and pain. Tr. 933. Summers had been unable to tolerate land-based therapy but the therapist felt that Summers might benefit from aquatic therapy. Tr. 933.

Summers continued with aquatic therapy. Tr. 946-949 (11/21/2017), 950-953 (11/24/2017), 954-957 (11/28/2017), 958-961 (12/8/2017), 962-968 (1/17/2018).

At her November 21, 2017, therapy session, Summers reported that she "felt so good after last session that [she] went to the gym and did [the] eliptical [sic] machine[.]" Tr. 946. However, she relayed that her "pain [was] much worse than on Friday." Tr. 946. During her November 28, 2017, session, Summers indicated that she had tried the stand-up elliptical and the

Case No. 1:20-cv-1280
Gwin, J.

recumbent bike at the gym and she felt that she had to exercise daily to
reduce the pain in her legs. Tr. 954. She had been "[a]ble to go about 25
minutes." Tr. 954. Summers relayed that her doctor did not want her to use
the treadmill because of arthritis in her knee and she was not going to the
gym on the days that she attended aquatic therapy. Tr. 954. On December 8,
2017, Summers stated she had "pain all over" and felt "tired all the time." Tr.
958. Summers was sick in December so she did not attend any additional
sessions in December. Tr. 962.

At a January 17, 2018, therapy session, Summers complained of pain down
her left leg; she no longer had pain going down her right leg. Tr. 962.
Summers reported some stress incontinence with coughing. Tr. 962. She
was advised to follow up with her referring doctor. Tr. 962. The therapist
observed an antalgic gait (left lower extremity) and straight leg raise (left
lower extremity). Tr. 964.

Summers saw Nurse Stevens on January 25, 2018, for follow up. Tr. 1071.
Summers reported neck pain and left lower extremity pain. Tr. 1071. She
indicated that her lower extremity pain was constant and radiated from her
buttocks to her foot. Tr. 1071. She relayed that she had been limping for
three weeks. Tr. 1071. Summers was concerned about falling, noting she had
already had a fall when her leg gave out. Tr. 1071. Her medication took the
"edge off" but she was still having a lot of discomfort. Tr. 1071. Summers
indicated that her leg was worse than her neck; aquatic therapy was helping
with her neck pain. Tr. 1071. Summers needed a new order for therapy for
her back and lower extremities. Tr. 1071. Examination findings were similar
to the findings from Summers' visit with Nurse Stevens in November 2017.
Tr. 1038, 1076-1077. However, Summers had a positive straight leg raise test
on the left with radicular symptoms. Tr. 1077. Nurse Stevens provided
Summers with a prescription for therapy for her back. Tr. 1077.

On February 1, 2018, Summers' physical therapist discontinued therapy,
noting that Summers had "not returned to therapy or scheduled additional
follow-up appointments." Tr. 969. At that time, it was noted that "[b]ased on
the most recent progress report, patient was progressing slower than
expected toward functional goals based on pain levels and appointment
compliance." Tr. 969.

On February 12, 2018, Summers resumed physical therapy. Tr. 971-979.
Summers' physical therapist recommended that Summers proceed with land-
based therapy rather than aquatic therapy. Tr. 971. Summers' gait was
independent but her "stance and push off [was] decreased [in] [left lower
extremity[]." Tr. 972. During a March 6, 2018, visit, Summers' chief
complaint was "difficulty walking, weakness of her legs, [n]umbness of both

-8-

Case No. 1:20-cv-1280
Gwin, J.

feet, low back stiffness with difficulty static positions and prolonged walking." Tr. 980. Summers' therapist noted that Summers "present[ed] with impairments of stiff low back, [positive] left straight leg raise, stiff left hip adduction, external rotation and weak left hip flexion and abduction (more than [right] hip)." Tr. 980 (capitalization omitted). Summers "walk[ed] with poor push off BLE[bilateral lower extremity]." Tr. 980. Summers did not show for a March 12, 2018, therapy appointment. Tr. 985-986. A message was left for her reminding her of the no-show policy. Tr.985. Summers did not show again for therapy on March 19, 2018. Tr. 987. Because of the two consecutive no shows, the therapist spoke with Summers on the telephone. Tr. 987. Summers agreed with her therapist to be discharged from therapy "at [that] time due to extended illness." Tr. 987.

Summers saw Nurse Stevens on May 10, 2018, complaining of increased neck pain that was more intense since the prior week. Tr. 1096. Summers wanted a neck collar and relayed that her neck was really stiff after waking up and her shoulders had really been itching. Tr. 1096. Summers indicated she attended some therapy sessions for her sciatica but the therapist did not have her in the water. Tr. 1096. Cervical and neurological examination findings were similar to those from her November 2017 visit with Nurse Stevens. Tr. 1038, 1102. Nurse Stevens refilled Summers' Percocet and Flexeril. Tr. 1102. She recommended that Summerswear a cervical collar and follow up in three months. Tr. 1102.

On August 6, 2018, Summers saw Marion Craig, APRN-CNP, at Metro Health for an urgent visit. Tr. 1142. Summers complained of left leg pain, explaining that she was interested in a second referral to rheumatology. Tr. 1142. Summers relayed that her pain started in her hip and radiated down to her left knee. Tr. 1142. At that time, Summers rated her leg pain as a 10/10. Tr. 1142. She was taking Percocet, Flexeril, and Motrin for pain relief. Tr. 1142.

Summers also indicated that she had been dealing with shortness of breath. Tr. 1142. She relayed that testing that had been ordered was positive for asthma and she was instructed to follow up with pulmonary but she first needed a referral. Tr. 1142. She was taking Albuterol as prescribed. Tr. 1142. On examination, Nurse Craig observed a normal gait. Tr. 1143. Nurse Craig advised Summers to continue with her medication as prescribed and she provided referrals,including to rheumatology for her left leg pain and to pulmonary for her asthma. Tr. 1143.

The next day, on August 7, 2018, Summers went to the emergency room with multiple complaints, including jaw pain, left leg pain, and shortness of breath. Tr. 1171. On examination, Summers' strength was 5/5 in bilateral

Case No. 1:20-cv-1280
Gwin, J.

upper and lower extremities, sensation to light touch was intact in all four extremities, and gait was normal. Tr. 1174. Testing revealed no evidence of pulmonary embolism or acute cardiopulmonary process and an ultrasound was negative for deep vein thrombus in the left lower extremity. Tr. 1177. Summers was instructed to follow up with her doctor and she was discharged home. Tr. 1177.

Summers saw Nurse Stevens on August 23, 2018, for follow up. Tr. 1212. Summers relayed that she was seen in the hospital for possible [Temporomandibular joint dysfunction]. Tr. 1212. She continued to have radicular symptoms and her neck felt heavy. Tr. 1212. Summers was interested in attending physical therapy at an outside facility. Tr. 1212. Cervical and neurological examination findings were similar to those from her May 2018 visit with Nurse Stevens.  Tr. 1102, 1218.  Nurse Stevens indicated that, other than Summers' new reported TMJ symptoms, Summers' symptoms were the same. Tr. 1218. Medications were continued/refilled and Summers was instructed to continue use of cervical collar.  Tr. 1218.

Summers saw Nurse Stevens again on November 29, 2018, for follow up regarding her chronic pain. Tr. 1295. Summers reported that she had been urinating on herself during the last few months; she was using pads. Tr. 1295. Summers had functional capacity forms from her attorney.  Tr. 1295. She had started a part-time job that involved a lot of walking.  Tr. 1295.

With respect to Summers' lumbar stenosis, Nurse Stevens indicated that in her opinion, Summers was "physically disable[d]. Chronic pain, limited ROM, and sensory dysfunction[.]" Tr. 1301. Nurse Stevens refilled Summers' Percocet, noted that she would complete the functional capacity form once the fee was received, and she instructed Summers to follow up in three months. Tr. 1301.

A sleep study performed in January 2019 resulted in diagnoses of obstructive sleep apnea, obesity, inadequate sleep hygiene, lack of adequate sleep, possibly restless leg syndrome, and possible advanced sleep phase syndrome. Tr. 1282, 1285. Summers' sleep apnea was deemed to be clinically significant, warranting treatment. Tr. 1286.

Mental health impairments

Upon Nurse Foster-Geeter's referral, on December 27, 2017, Summers had a mental health assessment completed by Stacy Caldwell, Ph.D., at Metro Health. Tr. 1056. Summers' chief complaint was anxiety and depression. Tr. 1056. Summers relayed that she felt agitated and overwhelmed. Tr. 1057. She did not feel she had the strength to do things that needed to be done. Tr.

Case No. 1:20-cv-1280
Gwin, J.

1057.  She reported daily anxiety and difficulty sleeping—she worried about being able to take care of herself.  Tr. 1057.  On examination, Dr. Caldwell observed that Summers was adequately groomed; her concentration was sustained; her behavior was described as "talkative"; her mood was depressed; her affect was congruent; her speech was pressured; her thought process was logical; she endorsed suicidal ideation but no plan of self-harm; she denied homicidal ideation; her cognition was within normal limits; her insight was fair; and her judgment was good. Tr. 1059. Dr. Caldwell's diagnosis was adjustment disorder with mixed anxiety and depression. Tr. 1060. Dr. Caldwell's recommendations included follow up for counseling and scheduling with a psychiatric provider. Tr. 1060.

During a January 10, 2018, behavioral health counseling and therapy session, Summers reported having pain all over with concentrated pain behind her left knee.  Tr. 1065.  Dr. Caldwell observed that Summers was anxious; her thought process was logical and organized; her judgment and insight were good, fair; her recent and remote memory were within normal limits; her attention span and concentration was sustained; her mood was euthymic; and her affect was full range. Tr. 1066. Dr. Caldwell's impression was that Summers' symptoms were unchanged. Tr. 1066.

Summers saw Parvathi Nanjundiah, M.D., on March 1, 2018, for a mental health assessment update with pharmacological management. Tr. 1085-1090. Summers reported that she felt her depression was less intense with Cymbalta. Tr 1230. However, she did not feel that the Trazodone was effective. Tr. 1230. Dr. Nanjundiah observed that Summers' gait was within normal limits. Tr. 1090. Summers' mood was noted to be depressed, anxious and she had a full affect. Tr. 1090. Summers was cooperative; her thought process was logical and organized; her attention/concentration was sustained; her recent and remote memory was within normal limits; her judgment and insight were good; there was no evidence of paranoia or delusions; and there were no suicidal or homicidal ideations.  Tr. 1090.  Dr. Nanjundiah's diagnostic impression was dysthymia, generalized anxiety disorder.  Tr. 1090. Dr. Nanjundiah started Summers on Cymbalta for anxiety and depression and added Trazodone as needed for sleep.  Tr. 1091.

When Dr. Nanjundiah saw Summers on September 20, 2018, Summers' mental status examination findings were similar to those observed during her March 2018 visit. Tr. 1090, 1230. Dr. Nanjundiah's diagnostic impression remained dysthymia, generalized anxiety disorder.  Tr. 1230.  Dr. Nanjundiah increased Summers' Cymbalta and Trazodone.  Tr. 1231.

Case No. 1:20-cv-1280
Gwin, J.

### 2. Opinion evidence

<u>Consultative examiner (mental health impairment opinion)</u>

On April 5, 2017, Natalie M. Whitlow, Ph.D., completed a consultative psychological evaluation. Tr. 691-699. Summers attended the evaluation and, at Summers' request, Summers' aunt sat in during the evaluation "for moral support and the gathering of relevant information[.]" Tr. 692. Dr. Whitlow listed the following diagnoses: generalized anxiety disorder and unspecified depressive disorder. Tr. 696-697.

In the "summary and conclusions" section of her evaluation, Dr. Whitlow noted that Summers "did report experiencing symptoms of depression and anxiety in her daily life[]" Tr. 698.  However, Dr. Whitlow noted that Summers "did not identify experiencing any mental health symptoms that impair her ability to effectively engage in the work world[]" and, also, Summers indicated that her reported symptoms "[did] not impair her ability to effectively engagein the work world." Tr. 698. Dr. Whitlow concluded her summary by stating, "the current evaluator did not gather sufficient information to support concluding that her mental health symptoms impair her ability to effectively engage in the work world."  Tr. 698.

Additionally, Dr. Whitlow found that Summers did not appear to have any limitations in the four functional areas of understanding, remembering, and carrying out instructions; maintaining attention and concentration, and in maintaining persistence and pace to perform simple tasks and to perform multi-step tasks; responding appropriately to supervision and to coworkers in a work setting; and responding appropriately to work pressures in a work setting. Tr. 698.

<u>State agency reviewing consultants (mental health impairment opinions)</u>

On initial review, on April 18, 2017, state agency reviewing psychological consultant, Bruce Goldsmith, Ph.D., completed a psychiatric review technique ("PRT"), finding that "[f]rom a psychological point, Summers' conditions appear[ed] to be non[-]severe." Tr. 85-86. In reaching his opinion, Dr. Goldsmith found that Summers had no limitation in her ability to understand, remember or apply information or in her ability to interact with others and, he found that Summers had mild limitation in her ability to concentrate, persist, or maintain pace and in her ability to adapt and manage oneself. Tr. 86.

On reconsideration, on August 5, 2017, state agency reviewing psychologist, Deryck Richardson, Ph.D., completed a PRT. Tr. 118-119. Dr. Richardson

Case No. 1:20-cv-1280
Gwin, J.

agreed with Dr. Goldsmith's opinion that Summers' mental conditions were non-severe. Tr. 119.

<u>State agency reviewing consultants (physical impairment opinions)</u>

On initial review, on May 19, 2017, state agency reviewing consultant Linda Hall, M.D., completed a physical RFC assessment. Tr. 87-90. Dr. Hall opined that Summers had the RFC to occasionally lift and/or carry 20 pounds and frequently lift and/or carry 10 pounds; stand and/or walk for a total of about 6 hours in an 8-hour workday; sit for a total of about 6 hours in an 8-hour workday; and push and/or pull "[u]nlimited, other than shown, for lift and/or carry[.]" Tr. 88. Dr. Hall opined that Summers had the RFC to never climb ladders/ropes/scaffolds; occasionally climb ramps/stairs and crawl; frequently stoop, kneel, and crouch; and balance unlimitedly. Tr. 88. Dr. Hall explained that the postural limitations were due to Summers' chronic back pain. Tr. 88. Dr. Hall also opined that, due to her chronic back pain, Summers should avoid even moderate exposure to hazards. Tr. 89-90.

On reconsideration, on August 5, 2017, state agency reviewing consultant, Steve E. McKee, completed a physical RFC assessment. Tr. 120-123. Dr. McKee affirmed Dr. Hall's findings. Tr. 120-123.

<u>Hearing testimony</u>

1.  Plaintiff's testimony

Summers testified and was represented at the hearing. Tr. 37, 43-63. Summers explained that her sales job was difficult for her because it requires a lot of walking. Tr. 50. She indicated that she is supposed to park her car in a particular area and walk to different businesses. Tr. 50. However, she is unable to manage all the walking so she drives from business to business but doing so slows her down. Tr. 50. For example, she is supposed to see 100 prospective customers each day but she physically is unable to do so. Tr. 50. She estimated seeing only four or five prospective customers each day. Tr. 51. She explained that, due to her chronic pain, the weather can limit how many days she works each week. Tr. 51. Also, since her surgery, Summers has a restricted airway that requires her to use an inhaler and it limits how far she can walk. Tr. 51, 56-57. Although challenging, Summers indicated that she took the job because she did not have money. Tr. 57.

Summers relayed that she had her neck surgery on February 1, 2017. Tr. 51-52. When asked why she decided to have her surgery, Summers indicated that, before her surgery, her feet had been falling asleep. Tr. 52. Also, she had numbness and tingling in her hands and arms. Tr. 52. Summers was

-13-

Case No. 1:20-cv-1280
Gwin, J.

also losing control of her bladder. Tr. 53. After some diagnostic testing,
Summers' doctors informed her that her spinal cord was compressed behind
her esophagus and she needed to have surgery or she would become
paralyzed. Tr. 52. Summers was told that any damage to her feet and hands
that had occurred prior to the surgery could not be reversed so, even after
the surgery, Summers still has numbness and pain in her hands and feet. Tr.
52. She also still has some incontinence, which she thinks is now related to
nerves in her lower back. Tr.53, 55.  She relayed that the benefit to having
the surgery was "[n]ot being paralyzed." Tr. 52.

Summers has really bad pain in her hands and they cramp. Tr. 53. She also
has cramping in her legs and feet too. Tr. 54. They are trying to determine
whether she has rheumatoid arthritis because it runs in the family. Tr. 53.
She also continues to have severe weakness on her left side that she had
before her surgery but "never got back."  Tr. 53.

In addition to other issues noted, Summers explained that she has muscle
spasms and does not sleep well at night. Tr. 62-63. Also, her neck and low
back problems make it difficult for her to sit for long periods of time. Tr. 55-
56. She has to move around a lot and, when she stands up, she has to wait a
few minutes before walking because her body locks up. Tr. 55-56. She feels
like her neck is really heavy. Tr. 56.  Her feet fall asleep.  Tr. 56.  Also, her
left leg will give out if she does not watch it. Tr. 56. Summers has a cane
because she has fallen in the past. Tr. 56.  Summers keeps her cane in her
car all the time. Tr. 56.

Summers tried land therapy but she explained that it was really painful
because, as part of therapy, they pressed on her back which caused pressure
on her lungs and she could not breathe. Tr. 54.  Water therapy helped but
once she got out of the water she was exhausted. Tr. 54-55.

Summers did not think she would be able to work an eight-hour per day job
because she cannot stand for too long and she cannot sit in one position for
too long. Tr. 57.  Summers explained that doing anything too much or for too
long causes her pain.  Tr. 58, 59.  She estimated being able to stand for
about 10-15 minutes before starting to feel pain. Tr. 59. Summers can carry a
gallon of milk but would not be able to carry a gallon of milk in each hand.
Tr. 60. After writing for about a minute, Summers has to take a break because
her hands cramp up.  Tr. 61.  She does not use a computer often.  Tr. 61.
Instead, she uses her phone but she has to take breaks because she cannot
hold her head down for long periods of time and she gets cramps in her
hands.  Tr. 61.

-14-

Case No. 1:20-cv-1280
Gwin, J.

Summers takes Flexeril and Percocet for her pain. Tr. 61-62. She tried
gabapentin but it made her feel sick. Tr. 61. Summers took other
medications, including blood pressure medication, Cymbalta, and
Trazadone. Tr. 62. Summers indicated she took the Trazadone for sleep
because she has severe anxiety at night.  Tr. 62.  Summers' medications "put
[her] out." Tr. 62. She also uses a sleep apnea machine. Tr. 62. Summers said
she did not have the sleep apnea machine before her surgery. Tr. 62. Her
doctor told her the sleep apnea issues had something to do with the nerves
in her neck. Tr. 62. When Summers is engaged in certain activities, such as
work or driving, and cannot take her pain medication, she uses ibuprofen.
Tr.62.

2.  Vocational expert's testimony

A Vocational Expert ("VE") testified at the hearing. Tr. 63-66. The VE
described Summers' past work as a home attendant to be a semi-skilled,
medium level exertion job. Tr.63.

For her first hypothetical, the ALJ asked the VE to assume an individual who
could engage in light exertional work but should never climb ladders, ropes,
or scaffolds; could occasionally climb ramps and stairs; could frequently
stoop, kneel, and crouch; could occasionally crawl; should avoid working
around dangerous moving equipment or operating dangerous moving
equipment such as power saws or jackhammers; no work in unprotected
heights; and avoidance of concentrated exposure to extreme cold, humidity,
and wetness. Tr. 64. The ALJ asked the VE whether there would be any work
that the described individual could perform. Tr. 64. In response, the VE
indicated that the described individual would be able to perform the
following jobs: mail clerk, inspector and hand packager, and electronics
worker.  Tr. 64.  The VE provided national job numbers for the three jobs
identified.  Tr. 64.

For her second hypothetical, the ALJ asked the VE to add to the first
hypothetical that the person would be off task 10 percent of the day. Tr. 65.
The VE indicated that being off task 10 percent of the day was within an
acceptable tolerance, explaining that up to 15 percent was acceptable. Tr.
65.

For her third hypothetical, the ALJ asked the VE to add to the first
hypothetical that the individual would come in late one day each month,
leave early one day each month, and be absent one day each month on a
regular and recurring basis. Tr. 65. The VE indicated that that additional
limitation would be beyond acceptable tolerances. Tr. 65.

Case No. 1:20-cv-1280
Gwin, J.

> In response to questioning by Summers' counsel, the VE indicated that there would be no jobs available if the individual described in the first hypothetical was capable of no more than 10 percent (which is below occasional) handling, fingering and feeling during an eight-hour workday. Tr. 65-66. Also, in response to further questioning by Summers' counsel, the VE indicated that there would be no work available if the individual could only occasionally handle, finger and feel and would occasionally need to use a cane for standing and walking.  Tr. 66.[5]

On April 9, 2019, following the hearing, the ALJ denied Plaintiff Summers' supplemental security income and disability insurance benefits application.[6]  The ALJ found that Summers suffered from severe cervical degenerative disc disease, lumbar degenerative disc disease, asthma, and obesity impairments.[7]  The ALJ also found that Summers had non-severe depression, anxiety, and sleep apnea impairments.[8]

Despite these impairments, however, the ALJ found that Summers had the residual functional capacity to:

> [P]erform light work as defined in 20 C.F.R. § 404.1567(b) except she can never climb ladders, ropes or scaffolds; she can occasionally climb ramps and stairs; she can frequently stoop, kneel, crouch and occasionally crawl; she should avoid working around dangerous moving equipment or operating dangerous moving equipment such as power saws and jackhammers; she cannot perform work in unprotected heights; she must avoid concentrated exposure to extreme cold, humidity, and wetness.[9]

Based on this residual functional capacity finding, the ALJ concluded that Summers could perform national economy jobs, such as mail clerk, inspector/hand packager, and electronics worker.[10]

---

[5] Doc. 22 at 2–22.
[6] Doc. 13 at 19–32.
[7] *Id.* at 22.
[8] *Id.*
[9] *Id.* at 26.
[10] *Id.* at 31–32.

Case No. 1:20-cv-1280
Gwin, J.

On April 16, 2020, the Appeals Council denied Plaintiff Summers' review request, making the ALJ's decision the final decision of the Commissioner.[11]

On June 11, 2020, Plaintiff filed for review of the Commissioner's decision in this Court.[12]  On June 24, 2021, Magistrate Judge Burke recommended that the Court affirm the Commissioner's decision.[13]  Plaintiff objects to the R&R,[14] and the Commissioner responds.[15]

## II.    LEGAL STANDARD

### A.  Disability Standard

To establish disability under the Social Security Act, a claimant must show "inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than twelve months."[16] The claimant's impairment must prevent her from doing her previous work, as well as any other work existing in significant numbers in the national economy.[17]

### B.  Substantial Evidence Review

The Federal Magistrates Act requires a district court to conduct *de novo* review of the claimant's R&R objections.[18]   Both the Magistrate and this Court's review of the ALJ's

---

[11] *Id.* at 5.
[12] Doc. 1.
[13] Doc. 22.
[14] Doc. 23.
[15] Doc. 24.
[16] *See* 42 U.S.C. § 423(d)(1)(A).
[17] *See* 42 U.S.C. § 423(d)(2)(A).
[18] 28 U.S.C. § 636(b)(1).

-17-

Case No. 1:20-cv-1280
Gwin, J.

decision is limited to whether the decision is "supported by substantial evidence and was made pursuant to proper legal standards."[19]

Substantial evidence is "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion."[20]  Put differently, it is "more than a mere scintilla of evidence," "but less than a preponderance."[21]  When substantial evidence supports the ALJ's decision, a court may not reverse, even if the court would arrive at a different conclusion than the ALJ.[22]  On review, this Court may not resolve evidentiary conflicts or decide credibility questions.[23]

### III.    DISCUSSION

Plaintiff Summers raises two R&R objections: (1) the ALJ incorrectly accorded great weight to the opinions of State Agency reviewing psychologists Goldsmith and Richardson in finding that Summers' mental health conditions were non-severe; and (2) the ALJ did not follow governing law when assessing Summers' subjective reports of debilitating pain.  The Court takes these arguments in turn.

Beginning with the psychological medical opinions, the Court acknowledges that the ALJ must "always give good [record-based] reasons" when assigning weight to medical opinion evidence.[24]  The ALJ must account for whether a physician's opinion is based on

---

[19] *Rogers v. Comm'r of Soc. Sec.*, 486 F.3d 234, 241 (6th Cir. 2007) (citing 42 U.S.C. § 405(g)).

[20] *Biestek v. Berryhill*, 139 S. Ct. 1148, 1154 (2019).

[21] *Brown v. Comm'r of Soc. Sec.*, 814 F. App'x 92, 95 (6th Cir. 2020) (citing *Biestek*, 139 S. Ct. at 1154; then citing *Rogers*, 486 F.3d at 241).

[22] *Lindsley v. Comm'r of Soc. Sec.*, 560 F.3d 601, 604 (6th Cir. 2009).

[23] *White v. Comm'r of Soc. Sec.*, 572 F.3d 272, 287 (6th Cir. 2009).

[24] *Blakely v. Comm'r of Soc. Sec.*, 581 F.3d 399, 406 (6th Cir. 2009) (citing 20 C.F.R. § 404.1527(d)).

Case No. 1:20-cv-1280
Gwin, J.

"review of a complete case record."[25]  When assigning more weight to an opinion based on an incomplete record, the ALJ must analyze the opinion in light of the omitted record evidence.[26]

The ALJ satisfied this standard in assessing the mental health medical opinion evidence.

The ALJ assigned "great weight" to the opinions of State Agency reviewing psychologists Goldsmith and Richardson that Plaintiff Summers "mental conditions . . . have no more than a minimal impact on her functioning" and are therefore "non-severe."[27]

Psychologists Goldsmith and Richardson reviewed Plaintiff's medical records on April 18 and August 5, 2017, respectively.  Goldsmith and Richardson's reviews necessarily did not include developments in Plaintiff's mental health records after August 5, 2017.

After August 5, 2017, Plaintiff participated in a weekly multidisciplinary outpatient psychotherapy group.[28] Plaintiff also attended counseling sessions, where Plaintiff reported a depressed mood and anxiety with chronic neck/back pain.[29]  However, objective findings from these sessions were normal.[30]

Accounting for these subsequent developments, the ALJ assigned "great weight" to Goldsmith and Richardson's opinions because they were "consistent with the findings . . . that the claimant has a mild limitation in her ability to concentrate, persist, or maintain pace"

---

[25] *Fisk v. Astrue*, 253 F. App'x 580, 585 (citing Soc. Sec. Rul. 96–6p, 1996 WL 374180, at *3).
[26] *Blakely*, 581 F.3d at 409.
[27] Doc. 13 at 123.
[28] *Id.* at 710.
[29] *Id.* at 873, 876, 1060–66, 1069–72, 1089–96.
[30] *Id.*

-19-

Case No. 1:20-cv-1280
Gwin, J.

based on the entire record.[31]  By considering Goldsmith and Richardson's opinions in light

of the complete record, the ALJ satisfied the governing procedural requirements in assigning

weight to Goldsmith and Richardson's opinions.[32]

Further, any technical error in the ALJ's medical opinion weighing was harmless.[33]

Plaintiff does not identify, and this Court cannot find, any basis to discredit psychologists

Goldsmith and Richardson's opinions in the later medical record developments.  Plaintiff

participating in a psychotherapy group, without more, does not show that her mental health

conditions are severe impairments.  Nor do the mental health checkups, which noted normal

objective findings, demonstrate a severe impairment.

    2. *The ALJ's Credibility Determination.*

Governing regulations require the ALJ to employ a two-part test in assessing a

claimant's subjective symptom reporting:

> First, the ALJ must determine whether a claimant has a medically determinable
> physical or mental impairment that can reasonably be expected to produce the
> symptoms alleged; second, the ALJ must evaluate the intensity, persistence,
> and functional limitations of those symptoms by considering objective medical
> evidence and other evidence, including: (1) daily activities; (2) the location,
> duration, frequency, and intensity of pain or other symptoms; (3) precipitating
> and aggravating factors; (4) the type, dosage, effectiveness, and side effects of
> any medication taken to alleviate pain or other symptoms; (5) treatment, other
> than medication, received for relief of pain or other symptoms; (6) any
> measures used to relieve pain or other symptoms; and (7) other factors
> concerning functional limitations and restrictions due to pain or other
> symptoms.[34]

---

[31] *Id.* at 24–25.
[32] *Fisk*, 253 F. App'x at 585 (citing Soc. Sec. Rul. 96–6p, 1996 WL 374180, at *3).
[33] *Ulman v. Comm'r of Soc. Sec.*, 693 F.3d 709, 714 (6th Cir. 2012) (noting that medical opinion weighing errors are subject to harmless error review).
[34] *Calvin v. Comm'r of Soc. Sec.*, 437 F. App'x 370, 371 (6th Cir. 2011) (citing 20 C.F.R. § 404.1529(c)).

-20-

Case No. 1:20-cv-1280
Gwin, J.

Here, the ALJ acknowledged that Plaintiff Summers' medically determinable impairments could produce the symptoms she complained about.[35]  However, the ALJ found that Summers' "statements concerning the intensity, persistence and limiting effects of these symptoms are not entirely consistent with the medical evidence and other evidence in the record."[36]

Plaintiff acknowledges that the ALJ reached this conclusion after "discuss[ing] the evidence which supported Plaintiff's allegations of disabling pain."[37]  However, Plaintiff nonspecifically claims that the ALJ "did not properly consider the evidence" in reaching the light work residual functional capacity finding.[38]

On review, Plaintiff's objection amounts to a request for *de novo* record evidence review, which this Court cannot do.  In determining that Plaintiff's reported symptom severity was not consistent with the record, the ALJ thoroughly considered Plaintiff's treatment history and treating physician's objective medical findings.  The ALJ also considered Plaintiff's daily activities, prescribed medications, and physical therapy.

Plaintiff does not identify any additional record evidence that the ALJ neglected to consider.  Rather, Plaintiff disagrees with the ALJ's decision.  Reasonable minds could differ regarding the ALJ's residual functional capacity finding.  However, because the ALJ's findings were supported by substantial evidence, this Court cannot disturb the ALJ's decision.[39]

### IV. CONCLUSION

---

[35] Doc. 13 at 27.
[36] *Id.*
[37] Doc. 23 at 2.
[38] *Id.*
[39] *Lindsley*, 560 F.3d at 604.

Case No. 1:20-cv-1280
Gwin, J.

For these reasons, this Court **OVERRULES** Plaintiff Summers' objections, **ADOPTS** the

R&R, and **AFFIRMS** the Commissioner's decision.

IT IS SO ORDERED

Dated:  September 20, 2021                    _s/      James S. Gwin_____
                                             JAMES S. GWIN
                                             UNITED STATES DISTRICT JUDGE